# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| OBADA MZAIK, | Civil Action No. 1:22-cv-00042-ACR |
| *Plaintiff*, | |
| v. | Complaint for Torture |
| | 28 U.S.C. § 1605A005 |
| SYRIAN ARAB REPUBLIC, | |
| *Defendant*. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

LIST OF DECLARANTS AND EXPERTS ...................................................................... viii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A.   The Assad Regime Used Its Intelligence Agencies, including AFI, to Arrest and
        Detain Perceived Opponents on a Massive Scale ................................................. 4

    B.   AFI Agents Tortured Plaintiff During his Detention at AFI Mezzeh ................................ 6

    C.   AFI Agents Inflicted Acts Causing Physical Pain or Suffering on Plaintiff ............................. 7

    D.   AFI Agents Inflicted Acts Causing Mental Pain or Suffering on Plaintiff ........................... 100

    E.   AFI Agents Inflicted Gender-Based Violence on Plaintiff ............................................. 133

    F.   AFI Agents Subjected Plaintiff to Abysmal Detention Conditions ................................... 15

    G.   Many Detainees Were Murdered or Forcibly Disappeared at AFI Mezzeh ........................ 177

PROCEDURAL HISTORY ............................................................................................... 200

LEGAL STANDARD ......................................................................................................... 200

ARGUMENT ..................................................................................................................... 21

I.    The Court Has Subject-Matter and Personal Jurisdiction. .......................................... 21

    A.   The Court Has Subject-Matter Jurisdiction Because Syria Is Not Entitled to
        Immunity for Torturing Plaintiff ...................................................................... 21

    B.   The Court has Personal Jurisdiction over Syria Because Subject-Matter Jurisdiction
        Exists and Syria Has Been Properly Served ....................................................... 23

II.   Syria is Liable for Torturing Plaintiff ........................................................................ 24

    A.   AFI Agents Tortured Plaintiff During His Detention ............................................. 24

      i.    AFI Agents Detained Plaintiff Under Their Custody and Physical Control ................ 24

      ii.   AFI Agents Intentionally Inflicted Severe Pain and Suffering
          on Plaintiff During His Detention ............................................................. 25

          a.   AFI Agents Brutally and Repeatedly Physically Beat Plaintiff During His
             Detention ....................................................................................... 25

          b.   AFI Agents Intentionally Inflicted Severe Mental Pain and Suffering
             on Plaintiff ...................................................................................... 26

          c.   Abysmal Conditions of Detention at AFI Mezzeh Caused Plaintiff Severe
             Physical and Mental Pain and Suffering ................................................. 28

      iii.  AFI Agents Deliberately Inflicted Severe Pain and Suffering on Plaintiff for
          Proscribed Purposes ............................................................................. 29

B.   The AFI Agents Who Tortured Plaintiff Were Officials, Employees, or Agents of Syria ........................................................................................................... 30

C.   Syria Caused Personal Injury to Plaintiff............................................................. 31

    i.    Syria Is Liable for False Imprisonment ...................................................... 31

    ii.   Syria Is Liable for Battery and Assault....................................................... 32

    iii.  Syria Is Liable for IIED .............................................................................. 33

III.  Having Established Syria's Liability, Plaintiff Is Entitled to Damages................................ 34

A.   Plaintiff Is Entitled to Damages for Pain and Suffering ...................................... 34

    i.    Plaintiff Is Entitled to Damages for Pain and Suffering Endured During Captivity ..................................................................................................... 35

    ii.   Plaintiff Is Entitled to an Additional Lump Sum to Compensate Him for Post-Release Pain and Suffering ................................................................ 36

B.   The Court Should Award Plaintiff Punitive Damages.......................................... 38

    i.    The Wealth of the Defendant...................................................................... 39

    ii.   The Character of Syria's Act ...................................................................... 39

    iii.  The Nature and Extent of Harm That Syria Intended to Cause ................. 40

    iv.   The Need for Deterrence ............................................................................. 44

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\* *Abedini v. Gov't of Islamic Republic of Iran*,
422 F. Supp. 3d 118 (D.D.C. 2019) .................................................................. *passim*

*Acosta v. Islamic Republic of Iran*,
574 F. Supp. 2d 15 (D.D.C. 2008) ................................................................... 35

*Acree v. Islamic Republic of Iraq*,
271 F. Supp. 2d 179 (D.D.C. 2003) ................................................................. 36

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
416 F.3d 1242 (11th Cir. 2005) ....................................................................... 28

\* *Azadeh v. Gov't of the Islamic Republic of Iran*,
2018 WL 4232913 (D.D.C. Sept. 5, 2018) ........................................... 36, 37, 39

*Belkin v. Islamic Republic of Iran*,
667 F. Supp. 2d 8 (D.D.C. 2009) ..................................................................... 34

*Cohen v. Islamic Republic of Iran*,
238 F. Supp. 3d 71 (D.D.C. 2017) ................................................................... 24

\* *Colvin v. Syrian Arab Republic*,
363 F. Supp. 3d 141 (D.D.C. 2019) .................................................................. *passim*

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*,
212 F. Supp. 2d 30 (D.D.C. 2002) ................................................................... 22

*Cronin v. Islamic Republic of Iran*,
238 F. Supp. 2d 222 (D.D.C. 2002) ................................................................. 36

*Daliberti v. Republic of Iraq*,
146 F. Supp. 2d 19 (D.D.C. 2001) ................................................................... 30

*Daliberti v. Republic of Iraq*,
97 F. Supp. 2d 38 (D.D.C. 2000) ..................................................................... 29

*Dawes v. Syrian Arab Republic*,
2023 WL 8529288 (D.D.C. Dec 8, 2023) ......................................................... 32

*Doe v. Qi*,
349 F. Supp. 2d 1258 (N.D. Cal. 2004) ........................................................... 29

*Elahi v. Islamic Republic of Iran*,
124 F. Supp. 2d 97 (D.D.C. 2000) ................................................................... 40

*Est. of Heiser v. Islamic Republic of Iran,*
659 F. Supp. 2d 20 (D.D.C. 2009) ...................................................................34

*Foley v. Syrian Arab Republic,*
249 F. Supp. 3d 186 (D.D.C. 2017) .................................................................28

*Force v. Islamic Republic of Iran,*
617 F. Supp. 3d 20 (D.D.C. 2022) ...................................................................41

*Frost v. Islamic Republic of Iran,*
419 F. Supp. 3d 112 (D.D.C. 2020) .................................................................39

*\* Gates v. Syrian Arab Republic,*
580 F. Supp. 2d 53 (D.D.C. 2008) .....................................................40, 45, 46

*Hekmati v. Islamic Republic of Iran,*
278 F. Supp. 3d 145 (D.D.C. 2017) .........................................................28, 29, 37

*Jaramillo v. Naranjo,*
2014 WL 4898210 (S.D. Fla. Sept. 30, 2014) ..............................................29

*\* Kilburn v. Islamic Republic of Iran,*
699 F. Supp. 2d 136 (D.D.C. 2010) ..........................................26, 28, 29, 36

*\* Kim v. Democratic People's Republic of Korea,*
774 F.3d 1044 (D.C. Cir. 2014) .......................................................... *passim*

*In re Korean Air Lines Disaster of Sept. 1, 1983,*
932 F.2d 1475 (D.C.Cir.1991) ..................................................................21, 22

*Maalouf v. Islamic Republic of Iran,*
923 F.3d 1095 (D.C. Cir. 2019) .....................................................................23

*Massie v. Gov't of the Democratic People's Republic of Korea,*
592 F. Supp. 2d 57 (D.D.C. 2008) ............................................................26, 28, 29

*Mueller v. Syrian Arab Republic,*
656 F. Supp. 3d 58 (D.D.C. 2023) ...................................................................22

*Nikbin v. Islamic Republic of Iran,*
517 F. Supp. 2d 416 (D.D.C. 2007) .................................................................35

*Price v. Socialist People's Libyan Arab Jamahiriya,*
274 F. Supp. 2d 20 (D.D.C. 2003) ............................................................28, 29

*\* Price v. Socialist People's Libyan Arab Jamahiriya,*
294 F.3d 82 (D.C. Cir. 2002) .....................................................................26, 30

*Price v. Socialist People's Libyan Arab Jamahiriya,*
  384 F. Supp. 2d 120 (D.D.C. 2005) ...................................................................39

*Princz v. Fed. Republic of Germany,*
  26 F.3d 1166 (D.C. Cir. 1994) ...................................................................24, 40

*Reed v. Islamic Republic of Iran,*
  845 F. Supp. 2d 204 (D.D.C. 2012) ...................................................................35

*Regier v. Islamic Republic of Iran,*
  281 F. Supp. 2d 87 (D.D.C. 2003) ...................................................................26, 28

*Republic of Iraq v. Beaty,*
  556 U.S. 848 (2009) ...................................................................23

*Rezaian v. Islamic Republic of Iran,*
  422 F. Supp. 3d 164 (D.D.C. 2019) ...................................................................26, 29

* *Saberi v. Islamic Republic of Iran,*
  541 F. Supp. 3d 67 (D.D.C. 2021) ................................................................. *passim*

*Salazar v. Islamic Republic of Iran,*
  370 F. Supp. 2d 105 (D.D.C. 2005) ...................................................................35

*Simpson v. Socialist People's Libyan Arab Jamahiriya,*
  326 F.3d 230 (D.C. Cir. 2003) ...................................................................24

*Sotloff v. Syrian Arab Republic,*
  525 F. Supp. 3d 121 (D.D.C. 2021) ...................................................................21

*Stansell v. Republic of Cuba,*
  217 F. Supp. 3d 320 (D.D.C. 2016) ...................................................................32, 33, 34

*Surette v. Islamic Republic of Iran,*
  231 F. Supp. 2d 260 (D.D.C. 2002) ...................................................................36, 37

*Sutherland v. Islamic Republic of Iran,*
  151 F. Supp. 2d 27 (D.D.C. 2001) ...................................................................30, 33

* *Thuneibat v. Syrian Arab Republic,*
  167 F. Supp. 3d 22 (D.D.C. 2016) ...................................................................21, 35

*United States v. Hassan,*
  No. 1:24-cr-00533 (N.D. Il. Nov. 18, 2024) ...................................................................6

*Warmbier v. Democratic People's Republic of Korea,*
  356 F. Supp. 3d 30 (D.D.C. 2018) ...................................................................39

* *Wyatt v. Syrian Arab Republic*,
   908 F. Supp. 2d 216 (D.D.C. 2012) ...............................................................24, 36, 37

**Statutes**

8 U.S.C. § 1101 ....................................................................................................................24

15 C.F.R. § 742.9(a)(2) (2013) ..............................................................................................2

28 U.S.C. § 1330 ...................................................................................................22, 24, 25

28 U.S.C. § 1350 note § 3(b) (1992).......................................................................25, 26, 27, 30

28 U.S.C. § 1605A .................................................................................................. *passim*

28 U.S.C. § 1608 .........................................................................................................21, 25

28 U.S.C. § 1330, 1332(a), 1391(f) and 1602-1611 ............................................... *passim*

**International Cases**

*Application of the Convention Against Torture and Other Cruel, Inhuman or*
   *Degrading Treatment or Punishment (Can. and Neth. v. Syria)*, Provisional
   Measures, 2023 I.C.J. 188 (Nov. 16, 2023) .......................................................................10

**Other Authorities**

Blocking Property of Certain Persons with Respect to Human Rights Abuses in
   Syria, Exec. Order No. 13572, 76 Fed. Reg. 24787 (May 3, 2011) ...........................................3

Blocking Property of the Government of Syria and Prohibiting Certain
   Transactions with Respect to Syria, Exec. Order No. 13582, 76 Fed. Reg.
   52209 (Aug. 22, 2011) .......................................................................................................3

David P. Stewart, The Foreign Sovereign Immunities Act: A Guide for Judges
   (2018) ................................................................................................................................23

U.N. G.A. Res. 77/301 (July 5, 2023)...................................................................................19

Kara Eyrich, Advisor for the Third Committee, U.S. General Comment at UNGA
   79 adoption of Third Committee resolution on the Situation of human rights in
   the Syrian Arab Republic (Dec. 17, 2024).......................................................................19

Press Release, Antony J. Blinken, U.S. Dep't of State, Imposing Sanctions on
   Syrian Financial Facilitators (May 30, 2023) ...................................................................3

Press Release, U.S. Dep't of Treasury, Administration Takes Additional Steps to
   Hold the Government of Syria Accountable for Violent Repression Against
   the Syrian People (May 18, 2011) ....................................................................................6

Press Statement on the Detention of Mazen Darwish, U.S. Dep't of State (Feb. 18, 2015) ...................................................................................................................3

Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33955 (May 21, 1980) ...............2, 23

Remarks by President Biden on the Latest Developments in Syria (December 08, 2024) ...................................................................................................................2

Sherry L. Murphy et. al, *Deaths: Final Data for 2021*, NAT'L VITAL STATS. REPS, Oct. 2024 ...............................................................................................................39

U.S. Dep't of Treasury, *Specially Designated Nationals and Blocked Persons List – Jamil Hassan* (2024) ...........................................................................................6

U.S. Dep't of Treasury, *Treasury Sanctions Syrian Regime Prisons, Officials, and Syrian Armed Group* (July 28, 2021) ...................................................................3

U.S. Dep't of State, State Sponsors of Terrorism, https://perma.cc/BC3A-X5GE (last visited Dec. 19, 2024) ...................................................................................2

## LIST OF DECLARANTS AND EXPERTS[1]

| DECLARANT | CITATION |
|---|---|
| **Obada Mzaik**: Plaintiff and former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Mzaik Decl. |
| **"Bulldozer Driver*"**: Former bulldozer driver for Damascus governorate | Bulldozer Driver Decl. |
| **"Gravedigger*"**: Former gravedigger for Damascus Bureau of Burials | Gravedigger Decl. |
| **Mazen Darwish**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Darwish Decl. |
| **Mahmoud Hamoud**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Hamoud Decl. |
| **Yaman Al-Qadri**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Al-Qadri Decl. |
| *Declarations Obtained with the Assistance of the Syrian Center for Media and Freedom of Expression (SCM)* | |
| **Hanadi Zahlout**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Zahlout Decl. |
| **Mohammad Munir Al-Fakir**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Al-Fakir Decl. |
| **Mohammed Ali Ibrahim Al-Najjar**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Al-Najjar Decl. |
| **Abdullah Hamid Al-Abdullah**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Al-Abdullah Decl. |
| **Safouh Muhammad Halema**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Halema Decl. |
| **Saber Suleiman Hamada**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Hamada Decl. |
| **Samir Muhiddin Al-Saadi**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Al-Saadi Decl. |

---

[1] An asterisk indicates that the use of a pseudonym has been requested.

| DECLARANT | CITATION |
|---|---|
| **Hassan Ahsoon**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Ahsoon Decl. |
| **"SCM-SLP-CJA-AFI-MB-T-011*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SCM.011 Decl. |
| **Mohamed Osama Nassar**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Nassar Decl. |
| **Osama Sawan**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Sawan Decl. |
| **Ahmad Quraitem**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Quraitem Decl. |
| **Ahmad Mohammad Salim Buqai**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Buqai Decl. |
| **Ahmad Abu Al-Kas**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Al-Kas Decl. |
| **Ahmad Maatouq**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Maatouq Decl. |
| **Firas Al-Barjas**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Al-Barjas Decl. |
| **Kamal Fares**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Fares Decl. |
| **"SCM-SLP-CJA-AFI-MB-T-020*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SCM.020 Decl. |
| **Raghda Awad**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Awad Decl. |
| **Taymaa Muhiddin**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Muhiddin Decl. |
| **"SCM-SLP-CJA-AFI-MB-T-023*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SCM.023 Decl. |

| DECLARANT | CITATION |
|---|---|
| *Declarations Obtained with the Assistance of the Syria Justice and Accountability Centre (SJAC)* | |
| **Ibrahim Al-Sheikh Hussein**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Hussein Decl. |
| **"SJAC.W002\*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SJAC.W002 Decl. |
| **"SJAC.W004\*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SJAC.W004 Decl. |
| **"SJAC.W005\*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SJAC.W005 Decl. |
| **"SJAC.W006\*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SJAC.W006 Decl. |
| **Walid Al-Aashban bin Abdullah**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Bin Abdullah Decl. |
| **Osama Natouf bin Ibrahim**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | Bin Ibrahim Decl. |
| **"SJAC.W009\*"**: Former detainee at Air Force Intelligence Branch at Mezzeh Military Airport | SJAC.W009 Decl. |

| EXPERT | CITATION |
|---|---|
| **Jaber Baker and Uğur Ümit Üngör**: Co-authors of *Syrian Gulag: Inside Assad's Prison System* | Baker and Üngör Rep. |
| **Bernard Duhaime**: Former Chair of the United Nations Working Group on Enforced or Involuntary Disappearances | Duhaime Rep. |
| **Dr. Claudio Grossman**: Former Chair of the United Nations Committee against Torture | Grossman Rep. |
| **Dr. Pau Pérez-Sales**: Psychiatrist focused on political violence and the psychological effects of torture | Pérez-Sales Rep. |
| **Joumana Seif**: Legal advocate and expert on gender-based violence | Seif Rep. |

## INTRODUCTION

Plaintiff Obada Mzaik is an American citizen who moved to the Syrian Arab Republic ("Syria") with his family as a child.  In early January 2012, Plaintiff returned to Syria to be with his family.  A border control officer detained Plaintiff when he arrived at Damascus International Airport.  Security officers then ferried him through layers of Syrian government branches before ultimately transferring him to the Air Force Intelligence ("AFI") central branch at the Mezzeh Military Airport ("AFI Mezzeh") on January 10, 2012.

AFI agents kept Plaintiff captive at AFI Mezzeh's detention center, where he was tortured. AFI agents repeatedly interrogated Plaintiff and accused him of engaging in anti-regime activities. They brutally and repeatedly beat and whipped him, and threatened to electrocute him.  They held him in abysmal detention conditions.  They forced him to witness the torture of other detainees, including his cousin.  Plaintiff wished for his own death to escape the misery of his detention.

Plaintiff's experience was not an isolated incident.  As documented in the 35 accompanying witness declarations, including from former AFI Mezzeh detainees and individuals who worked for Syrian intelligence agencies, as well as the five expert witness reports submitted in support of this motion, there is incontrovertible evidence of the widespread and systematic campaign of detention, interrogation, torture, and murder of civilians by the regime of President Bashar al-Assad ("Assad regime") to suppress perceived opposition to Assad's authoritarian rule.  Even as thousands of detainees have been released after the historic fall of the Assad regime on December 8, the physical, psychological, and social harms suffered by Plaintiff, other detainees, their families, and Syrian society as a whole continue.  As of this motion's filing, at least 100,000 people remain missing, many presumed dead.

The evidence presented by Plaintiff establishes that Syrian officials subjected him to torture, within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), while he was detained at AFI Mezzeh.  Under section 1605A of the FSIA, Plaintiff is entitled to both compensatory damages for his torture and punitive damages to deter governments from committing such outrageous conduct.

## STATEMENT OF FACTS

Syria is nominally a constitutional republic but functioned as a single-party dictatorship under the rule of the Assad family and its Arab Socialist Ba'ath Party from the 1970s until December 2024.  Baker and Üngör Rep. ¶ 21.  Hafez al-Assad ruled Syria from 1971 to 2000.  *Id.* His son, Bashar al-Assad, succeeded him and ruled for over two decades as President of Syria, head of the Ba'ath Party, and Supreme Commander of the Syrian Army and Armed Forces.  *Id.* ¶¶ 21, 32; Ex. A, U.N. Int'l, Impartial and Indep. Mechanism, *The Syrian Government Detention System as a Tool of Violent Repression* (Dec. 6, 2024) ¶¶ 237–38.  On December 8, 2024 opposition groups forced Bashar al-Assad to flee the country, ending the Assad family's rule over Syria.[2]  The United States has designated Syria as a state sponsor of terrorism since 1979, and continues to do so as of this filing.[3]

In March 2011, popular protests swept across Syria, inspired by the "Arab Spring"

---

[2] *See* Joe Biden, President of the United States, Remarks by President Biden on the Latest Developments in Syria (Dec. 08, 2024), https://perma.cc/K55B-EXXH ("At long last, the Assad regime has fallen. This regime brutalized and tortured and killed literally hundreds of thousands of innocent Syrians.").

[3] *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33955, 33956 (May 21, 1980) (codified at 15 C.F.R. pt. 385); U.S. Dep't of State, State Sponsors of Terrorism, https://perma.cc/BC3A-X5GE (last visited Dec. 19, 2024); 15 C.F.R. § 742.9(a)(2) (2013) ("The Secretary of State has designated Syria as a country whose government has repeatedly provided support for acts of international terrorism.").

movement and the arrest of fifteen school children in the city of Daraa.  Baker and Üngör Rep.
¶ 23; Ex. A, ¶¶ 5–6.  Protestors took to the streets, calling for political reform.  Baker and Üngör
Rep. ¶ 23; Ex. A, ¶¶ 5–6.  In response, the Syrian government developed a nationwide strategy to
suppress protests and perceived opponents to Assad's authoritarian rule.  Baker and Üngör Rep.
¶ 24; Ex. A, ¶¶ 7–10.  As part of its crackdown, the regime regularly fired on protestors with live
ammunition; attacked civilian populations; denied food, water, and medical services to civilian
populations; and forcibly disappeared, tortured, raped, and arbitrarily arrested perceived political
dissidents, activists, the press, civil society, and their families.  Baker and Üngör Rep. ¶ 24.  The
United States condemned the Assad regime's brutal crackdown, and beginning in 2011, sanctioned
Syria and its leadership, including for the "use of violence and torture against, and arbitrary arrests
and detentions of, peaceful protestors."[4]  For over a decade, the Assad regime's unrelenting assault
on civilians has been extensively documented by Syrian and international human rights
organizations, as well as the Independent International Commission of Inquiry on the Syrian Arab
Republic (the "COI on Syria"), which the United Nations Human Rights Council established to

---

[4] Blocking Property of Certain Persons with Respect to Human Rights Abuses in Syria, Exec.
Order No. 13572, 76 Fed. Reg. 24787 (May 3, 2011); *see also* Blocking Property of the
Government of Syria and Prohibiting Certain Transactions with Respect to Syria, Exec. Order No.
13582, 76 Fed. Reg. 52209 (Aug. 22, 2011) (imposing sanctions for "the Government of Syria's
continuing escalation of violence against the people of Syria"); Press Statement on the Detention
of Mazen Darwish, U.S. Dep't of State (Feb. 18, 2015) (calling for the release of journalist and
human rights advocate Mazen Darwish and noting the "[w]ell-documented and horrific abuse
within the Syrian detention system"); U.S. Dep't of Treasury, *Treasury Sanctions Syrian Regime
Prisons, Officials, and Syrian Armed Group* (July 28, 2021) (noting that "[t]he Assad regime
has waged a ruthless war against the Syrian people, imprisoning hundreds of thousands of
Syrians calling for reform and change, of whom at least 14,000 have been tortured to death.
More than 130,000 people reportedly remain missing or arbitrarily detained"); Press Release,
Antony J. Blinken, U.S. Dep't of State, Imposing Sanctions on Syrian Financial Facilitators (May
30, 2023) (designating companies and individuals for financing the Assad regime and
acknowledging "the atrocities committed by the regime on the Syrian people, some of which rise
to the level of war crimes and crimes against humanity").

investigate alleged violations of international human rights law in Syria since March 2011. *Id.*
¶¶ 10, 24.

### A. The Assad Regime Used Its Intelligence Agencies, including AFI, to Arrest and Detain Perceived Opponents on a Massive Scale

The Assad regime dramatically increased its use of detention as a means of cracking down on perceived political opponents beginning in 2011. Baker and Üngör Rep. ¶ 25; *see also* Ex. A, ¶ 294. Conservative estimates indicate that Syrian government forces detained 300,000 people between 2011 and 2022. Baker and Üngör Rep. ¶ 27. The true figure may be closer to one million. Seif Rep. ¶ 20; Ex. A, ¶ 17 (reporting one estimate of 1.2 million detainees).

State security detained people for leading student movements, participating in peaceful protests, joining opposition parties, and advocating for human rights.[5] Any perceived support for the opposition, even humanitarian support for displaced civilians, could result in arrest and prolonged detention.[6] The regime particularly focused on detaining those who publicized its crimes, such as journalists and advocates for press freedom.[7] One media worker was arrested and detained for uploading photos and videos of extrajudicial killings carried out by regime forces. SJAC.W002 Decl. ¶ 2.

Government forces also detained relatives or friends of those who opposed the regime. Seif Rep. ¶ 43; Ex. A, ¶ 53. Mass arrests targeting individuals associated with opposition families

---

[5] *See, e.g.*, Baker and Üngör Rep. ¶¶ 23–24; Darwish Decl., ¶¶ 16–21 (lawyer detained for work documenting human rights violations); Zahlout Decl. ¶ 3; Al-Fakir Decl. ¶¶ 2, 8; Al-Abdullah Decl. ¶ 2; Halema Decl. ¶ 2; Al-Saadi Decl. ¶ 32; Ahsoon Decl. ¶ 2; SCM.011 Decl. ¶ 10; Buqai Decl. ¶ 2; Maatouq Decl. ¶ 19; Al-Barjas Decl. ¶ 2; Fares Decl. ¶ 2; Awad Decl. ¶ 2; Muhiddin Decl. ¶ 2; SJAC.W002 Decl. ¶ 2; Bin Ibrahim Decl. ¶ 18; SJAC.W009 ¶ 13; Ex. A, ¶¶ 8, 28, 37–38, 48, 51.

[6] Seif Rep. ¶ 45; Maatouq Decl. ¶¶ 1–4 (helping wounded protestors); Awad Decl. ¶ 2 (providing humanitarian relief); Ex. A, ¶¶ 28, 48.

[7] Zahlout Decl. ¶ 3; Nassar Decl. ¶ 2; Darwish Decl. ¶ 4; Ex. A, ¶ 48.

and regions served as reprisals and warnings that opposition activities could result in detention and disappearance of friends, neighbors, and loved ones.  Seif Rep. ¶ 43; Duhaime Rep. ¶ 19; *see, e.g.*, Maatouq Decl. ¶ 22; Hamoud Decl. ¶ 9.  Government forces carried out mass arrests in ways that appeared "random" or "indiscriminate" "to incite terror in the local community."  Duhaime Rep. ¶¶ 21–22.  Even children were detained.[8]  The regime's widespread use of arrest and detention continued throughout Assad's rule.  Ex. A, ¶¶ 40–41.

Syria's four intelligence agencies—AFI, Military Intelligence, General Intelligence, and the Political Security Administration (collectively known as the "Mukhabarat")—were the backbone of the security apparatus that allowed the Assad regime to implement its repressive campaign.  *See* Baker and Üngör Rep. ¶ 25.  President Assad exercised command and control over the intelligence agencies.  *Id.* ¶ 32.  The agencies operated their own detention centers.  *Id.* ¶¶ 34–35.  They used sprawling networks of detention centers to carry out the regime's massive campaign of arrest, detention, interrogation, torture, and murder of civilians.  As public demonstrations spread in 2011, intelligence agencies arrested large swathes of protesters and other perceived opponents.[9]  The intelligence agencies, including AFI, worked with one another to process the influx of detainees from these mass arrests, initially holding detainees in temporary facilities before transferring them to intelligence agency branches, then often from one intelligence agency to another, as well as across the different branches of a single intelligence agency.  *Id.* ¶¶ 47–50.

---

[8] Mzaik Decl. ¶¶ 38–39; SCM.020 Decl. ¶ 25 (infant and 6-year-old); SJAC.W009 Decl. ¶ 42 (babies); SCM.011 Decl. ¶ 72 (7 to 14-year-olds); Al-Abdullah Decl. ¶ 6 (12 and 13-year-olds); Hamada Decl. ¶ 14 (same); Al-Kas Decl. ¶¶ 17, 29–30 (same); SJAC.W002 Decl. ¶ 22 (same); Awad Decl. ¶ 21; Muhiddin Decl. ¶¶ 11, 25, 27; SCM.023 Decl. ¶¶ 17, 25; Hussein Decl. ¶ 20; SJAC.W004 Decl. ¶ 14; SJAC.W008 Decl. ¶ 28; SJAC.W006 Decl. ¶ 27; Hamoud Decl. ¶¶ 43–44.

[9] Ex. A, ¶¶ 255–261, 300–03, 317–20; Baker and Üngör Rep. ¶ 47; *see also, e.g.*, Al-Fakir Decl. ¶¶ 2, 8; Al-Abdullah Decl. ¶ 2; Halema Decl. ¶ 2; Ahsoon Decl. ¶ 2.

AFI is the intelligence agency that was considered the most loyal to the Assad regime. Baker and Üngör Rep. ¶ 37. It is subject to U.S. Department of Treasury sanctions for its "complicity ... in the human rights abuses and repression of the Syrian people." Press Release, U.S. Dep't of Treasury, Administration Takes Additional Steps to Hold the Government of Syria Accountable for Violent Repression Against the Syrian People, (May 18, 2011), https://perma.cc/K47V-VGZW. Major General Jamil al-Hassan, the head of AFI when Plaintiff was detained, is also personally subject to U.S. sanctions, U.S. Dep't of Treasury, *Specially Designated Nationals and Blocked Persons List – Jamil Hassan*, (2024), https://perma.cc/4B8K-N92H (last visited Dec. 19, 2024), and was criminally indicted for war crimes for abuses committed against U.S. citizens and other detainees held at AFI Mezzeh. Indictment, *United States v. Hassan & Mahmoud*, No. 1:24-cr-00533 (N.D. Ill. Nov. 18, 2024). AFI had six branches in Damascus, Syria's capital, including the AFI Mezzeh complex, where it held Plaintiff. Baker and Üngör Rep. ¶¶ 40–41. As the regime's repressive campaign intensified, AFI Mezzeh gained notoriety as a key detention center for political prisoners and the brutality of AFI agents. *Id.* ¶ 48.

### B. AFI Agents Tortured Plaintiff During his Detention at AFI Mezzeh

Plaintiff was one of hundreds of thousands of civilians arrested and detained for his perceived opposition to the Assad regime. Baker and Üngör Rep. ¶ 27. He is an American citizen, who moved to Damascus as a child. Mzaik Decl. ¶ 1. When the Arab Spring began in 2011, Plaintiff was a university student in Damascus. *Id.* ¶ 2. After Plaintiff intervened to stop the brutal beating of a student during a peaceful anti-regime protest in summer 2011, government forces detained him for 35 days at an unknown location. *Id.* ¶ 3. After he was released, he returned to the United States to flee the increasing repression of the Syrian regime. *Id.* ¶ 4. In early January 2012, Plaintiff decided to return to Damascus to be with his family. *Id.* ¶ 6. Upon his arrival in

Syria, border control officers detained and interrogated him at Damascus International Airport.  *Id.*
¶¶ 7–8.  Syrian officials next transported Plaintiff to the civilian police Criminal Security Branch
in Baramkhah, Damascus, where they searched, interrogated, and detained him.  *Id.* ¶¶ 9–10.

Later that night, police officials turned Plaintiff over to one of the Syrian intelligence
agencies, the Political Security Administration Branch, in the al-Fahamah neighborhood of
Damascus.  *Id.* ¶ 11.  Political Security Administration Branch officials lined Plaintiff up with his
head against a wall and threatened to beat him if he moved.  *Id.*  For six days, officials interrogated
Plaintiff twice a day, with each session lasting at least two hours.  *Id.* ¶ 12.  They coerced him to
give them the passwords to his electronic devices, and social media, e-mail, and messaging
accounts.  *Id.* ¶ 12.  Plaintiff saw and heard detainees being beaten, punched, slapped, and whipped
with a leather lash.  *Id.* ¶¶ 11, 13.  Officials forced him to sign a false confession.  *Id.* ¶ 15.

On January 10, 2012, Political Security Administration Branch officials blindfolded
Plaintiff and transferred him to AFI Mezzeh.  *Id.* ¶ 16.  Plaintiff knew that he was at AFI Mezzeh
from a conversation he overheard between the officers who transferred him, and from under his
blindfold he could recognize the well-known highway to AFI Mezzeh.  *Id.*  He later confirmed
from conversations with other detainees that he was detained at AFI Mezzeh.  *Id.*

AFI members subjected Plaintiff to brutal physical and psychological abuse[10]—including
gender-based violence and abysmal detention conditions—upon his arrival, during interrogations,
and throughout his detention at AFI Mezzeh.  *Id.* ¶¶ 17–26.

### C.  AFI Agents Inflicted Acts Causing Physical Pain or Suffering on Plaintiff

When Plaintiff arrived at AFI Mezzeh, AFI agents gave him what they referred to as a

---

[10] Many acts involve both "physical" and "psychological" abuse.  For the sake of organizing the
numerous acts he was subjected to, however, Plaintiff has categorized certain acts as either
physical or psychological abuse.  *See* Grossman Rep. ¶ 26.

"welcome party." He was hooded, handcuffed, and forced to walk through a corridor of agents who beat him, choked him, threatened him with sexual violence, and called him a "dog" and a "Zionist." Mzaik Decl. ¶ 17. Plaintiff screamed in pain while the agents laughed. *Id.*

Throughout his detention at AFI Mezzeh, Plaintiff was "beaten dozens of times" during interrogations. *Id.* ¶ 28. AFI agents "punched [him] hundreds of times in the face," kicked him, and whipped him with a hose. *Id.* They handcuffed him during beatings, so he could not protect himself. *Id.* Among the "most painful" forms of beating was *falaqa or falanga*, where AFI agents beat Plaintiff's feet with a PVC pipe. *Id.* They once beat the soles of his feet at least 45 times, causing his feet to swell so much he could no longer stand. *Id.* These beatings, kicking, and choking caused severe pain. *Id.* ¶ 29. Plaintiff often "hoped to die as soon as possible so that [he] could avoid any further beatings or pain." *Id.* When Plaintiff was released, he had to be treated by doctors for four weeks because of the torture and abysmal detention conditions. *Id.* ¶ 47.

Other former detainees similarly describe the widespread and systematic use of physical torture at AFI Mezzeh, starting from the "welcome party"[11] and continuing throughout detention. AFI agents routinely and severely beat detainees in sensitive areas, including the soles of their feet, genitals, and face,[12] using objects such as sticks, hoses, electric cables, whips, and iron rods.[13]

---

[11] *See* Nassar Decl. ¶¶ 9–10; Sawan Decl. ¶¶ 7–8; Al-Barjas Decl. ¶ 4; SJAC.W006 Decl. ¶¶ 7–8; Ex. A, ¶ 14.

[12] For descriptions of *falaqa*, *see* Ahsoon Decl. ¶¶ 11; Sawan Decl. ¶ 14; Quraitem Decl. ¶ 15; SCM.020 Decl. ¶ 7; SJAC.W005 Decl. ¶ 13; Al-Saadi Decl. ¶ 16; Darwish Decl. ¶ 38; Ex. A, ¶ 141. For beating on genitals, *see* SCM.023 Decl. ¶ 9; Bin Abdullah Decl. ¶ 14; SJAC.W009 Decl. ¶ 40. For beating on face, *see* Ahsoon Decl. ¶ 10; Quraitem Decl. ¶ 3; Fares Decl. ¶ 13; SCM.020 Decl. ¶ 9; Muhiddin Decl. ¶ 16; SJAC.W004 Decl. ¶ 13; SJAC.W006 Decl. ¶ 12; Bin Abdullah Decl. ¶¶ 64–65.

[13] Al-Fakir Decl. ¶ 10, 17 (sticks, hoses); Sawan Decl. ¶ 12 (same); Quraitem Decl. ¶ 15 (same); Al-Najjar Decl. ¶ 15 (sticks); SJAC.W009 Decl. ¶ 38 (same); Hussein Decl. ¶ 15 (silicone stick and plumbing parts); Al-Abdullah Decl. ¶¶ 10–11 (electric baton, plastic pipes, cables); Halema Decl. ¶ 8, 12, 19 (sticks, hoses, electric cables, whips, pipes); Hamada Decl. ¶ 7, 16 (hoses, electric

Detainees at AFI Mezzeh were also subjected to and/or witnessed *shabeh*,[14] another of the regime's well-documented forms of torture whereby detainees are suspended by their wrists from a wall or ceiling in excruciating positions, often for hours. Baker and Üngör Rep. ¶¶ 56–57; *see also* Grossman Rep. ¶ 29 n.3. Plaintiff himself witnessed and was threatened with *shabeh*. Mzaik Decl. ¶¶ 33, 35. Among the other torture methods inflicted on AFI Mezzeh detainees were the administration of electric shocks,[15] burning of the body with cigarettes,[16] extracting teeth and nails,[17] dousing detainees with boiling or freezing water, especially after beating or electrocution,[18] forcing detainees to stand for hours or days,[19] and extended exposure to extreme heat or cold.[20] Baker and Üngör Rep. ¶¶ 52–61. As Plaintiff witnessed, even children were tortured.[21] Many

---

cables); Ahsoon Decl. ¶ 11 (pipes); SCM.011 Decl. ¶ 18, 26, 58–59 (sticks, hoses, whips, pipes); Al-Barjas Decl. ¶ 4 (hoses); Fares Decl. ¶ 7 (sticks, pipes); SCM.020 Decl. ¶ 7 (sticks, pipes); Awad Decl. ¶ 22 (heated metal rod); Muhiddin Decl. ¶ 16 (whips); SJAC.W002 Decl. ¶ 5, 13 (pipes); SJAC.W005 Decl. ¶ 18 (cables); Al-Kas Decl. ¶ 7 (cables, pipes); Hamoud Decl. ¶ 26 (pipes); SJAC.W004 Decl. ¶ 10, 14 (sticks, cables, whips); Darwish Decl. ¶ 41 (batons, cattle prods, and green plumbing pipes).

[14] Halema Decl. ¶ 14 (hung by his hands for 9 hours, and every guard who passed by would beat him); Al-Najjar Decl. ¶ 26; Al-Abdullah Decl. ¶ 8; Ahsoon Decl. ¶¶ 5, 25; Sawan Decl. ¶ 14; Al-Kas Decl. ¶ 7; Fares Decl. ¶ 19; SCM.020 Decl. ¶¶ 7–8; SCM.023 Decl. ¶ 9; SJAC.W004Decl. ¶ 10; SJAC.W007 Decl. ¶ 15; SJAC.W009 Decl. ¶ 21; Hamoud Decl. ¶ 34.

[15] Al-Abdullah Decl. ¶ 10; Halema Decl. ¶ 6; SCM.011 Decl. ¶ 18; Al-Kas Decl. ¶ 3; Maatouq Decl. ¶ 11; Al-Barjas Decl. ¶ 10; Fares Decl. ¶ 19; SCM.020 Decl. ¶ 14; SCM.023 Decl. ¶ 9; Hussein Decl. ¶ 8; SJAC.W002 Decl. ¶¶ 12–13; Bin Abdullah Decl. ¶ 14; Hamoud Decl. ¶ 40; Al-Qadri Decl. ¶ 16 (electrocuted with taser); Darwish Decl. ¶ 35 (electrocuted by cattle prods).

[16] Sawan Decl. ¶ 8; Al-Kas Decl. ¶ 8; SCM.023 Decl. ¶ 12; Hamoud Decl. ¶ 40.

[17] Al-Najjar Decl. ¶ 30; Sawan Decl. ¶ 20; Maatouq Decl. ¶ 34; SCM.023 Decl. ¶ 30.

[18] Al-Fakir Decl. ¶ 13; Al-Abdullah Decl. ¶ 10; Sawan Decl. ¶ 21.

[19] Al-Abdullah Decl. ¶ 20 (forced to stand for a week); Al-Najjar Decl. ¶ 26; Nassar Decl. ¶ 21; Al-Kas Decl. ¶ 7.

[20] SJAC.W004 Decl. ¶ 11 (left in the freezing cold for 36 hours and was semi-conscious as a result); Bin Abdullah Decl. ¶ 63 (drenched in freezing water, which resulted in death for some cellmates); Al-Najjar Decl. ¶ 20; Al-Abdullah Decl. ¶ 3; SCM.011 Decl. ¶ 57; Darwish Decl. ¶ 27 ("[H]e left me standing for three days in the snowy courtyard, without a coat or warm shirt. I was left there blindfolded and handcuffed for hours at a time.")

[21] Mzaik Decl. ¶ 38–39 ("I could hear the screams of a child being tortured nearby through the small openings at the top of my cell ... This was not the only child I saw while at Mezzeh."); Al-

former detainees continue to suffer serious physical injuries from the torture they endured.[22]

Physical torture of detainees was widespread and systematic at AFI Mezzeh, and across other regime detention centers. *See* Grossman Rep. ¶¶ 29, 50; Baker and Üngör Rep. ¶ 52 n.28. According to the COI on Syria, all parts of the Syrian security forces, including AFI, inflicted torture and ill-treatment against detainees as a "systematic" matter that "involved high-ranking officers." Baker and Üngör Rep. ¶ 11 n.22 (quoting COI on Syria, U.N. Doc. A/HRC/46/55, ¶ 25 (Mar. 11, 2021)); *see also* Ex. A, ¶¶ 101–118, 143–145, 154–60. The International Court of Justice credited these and other reports by the COI on Syria documenting the regime's continuing use of torture against detainees, including by the regime's intelligence forces, in its decision ordering Syria to take measures to prevent acts of torture. *Application of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Can. and Neth. v. Syria)*, Provisional Measures, 2023 I.C.J. 188, ¶ 72 (Nov. 16, 2023).

### D. AFI Agents Inflicted Acts Causing Mental Pain or Suffering on Plaintiff

During his detention at AFI Mezzeh, Plaintiff was forced to live in an "atmosphere of perpetual terror" that caused "horrific and long-lasting" mental pain. Mzaik Decl. ¶¶ 37, 42. Upon his arrival at AFI Mezzeh, an AFI agent threatened to kill Plaintiff and tried to choke him to death, before a Political Security Branch official intervened, telling the AFI agent that, while he was free to kill Plaintiff, he first had to sign a document acknowledging Plaintiff's transfer into AFI custody. *Id*. ¶ 17. AFI agents threatened Plaintiff with death, *shabeh*, electrocution, sexual assault, and

---

Kas Decl. ¶¶ 17, 29–30 (molestation and torture of children); SJAC.W004 Decl. ¶ 14 (detention of 15-year-olds who were tortured and raped with an iron rod until they bled); SJAC.W006 Decl. ¶ 27 (torture of 14-year-old).

[22] Seif Rep. ¶¶ 111–112; Baker and Üngör Rep. ¶¶ 73, 75; *see, e.g.*, Al-Najjar Decl. ¶¶ 19 (herniated disk and skin diseases); SCM.011 Decl. ¶ 63 (burns from candle torture make it difficult to walk); Sawan Decl. ¶¶ 37, 40–41; Quraitem Decl. ¶ 7; Maatouq Decl. ¶ 41 (disabled and unable to live on his own for more than two years); SJAC.W002 Decl. ¶ 12 (permanent vision problems).

other forms of torture. *Id.* ¶¶ 17, 27, 33–37.

Plaintiff was continually subjected to the sights and sounds of other detainees being tortured. *Id.* ¶ 35–40. AFI agents intentionally hung *shabeh* victims in open corridors for Plaintiff and other detainees to see. *Id*. ¶ 35–36. On the third night of Plaintiff's detention, AFI agents subjected a victim to *shabeh* in front of Plaintiff's cell. *Id.* ¶ 36. The AFI agents electrocuted the victim while he screamed and begged to be killed, stuffed the detainee's mouth with salt, and poured boiling water on his body. *Id.* Plaintiff also witnessed guards subjecting a room full of naked people, including children, to *shabeh*. *Id.* ¶ 39. He heard AFI agents whipping a naked boy and pouring freezing water on him as he begged for his mother. *Id.* ¶ 38. According to Plaintiff, "[t]his constant sight and sound of torture was ... psychological warfare." *Id.* ¶ 35.

AFI agents brought Plaintiff's cousin to AFI Mezzeh and they were interrogated together. *Id.* ¶ 33. Plaintiff's cousin already showed signs of having been severely beaten and had open sores on his wrists. *Id.* Plaintiff could hear his "cousin's piercing screams" as his cousin was "hung by his bound and already brutalized wrists." *Id.* The AFI agents threatened Plaintiff: if he did not confess, he would also suffer *shabeh* and be electrocuted. *Id.* They then took Plaintiff's cousin away. *Id.* Plaintiff and his family never saw him again. *Id.* They fear he was killed. *Id.*

Dr. Pau Pérez-Sales, a psychiatrist who specializes in the psychological impacts of torture, concluded that the trauma of detention, being tortured, and witnessing torture caused Plaintiff to experience "severe psychological harm, both during his time in detention, and in the years that followed." Pérez-Sales Rep. ¶ 39. Dr. Pérez-Sales observed that Plaintiff hoped for his death, and suffered from "severe post-traumatic stress disorder" ("PTSD"), "feelings of anguish when something reminds him of the stressful experience, extreme avoidance attitude, trying to avoid contact with any element that reminds him of the events that happened[,] ... second stage insomnia

with frequent nightmares whose contents remind him of the torture events suffered," sadness, irritability, and anxiety. *Id.,* Ex. B, at 11.

Other former detainees corroborate that threats of death and torture were widespread at AFI Mezzeh.[23]  AFI agents regularly tortured individuals in full view of other detainees.[24]  AFI Mezzeh detainees describe the extreme psychological fear caused by this environment: one witness said hearing others' torture "was often more difficult than experiencing my own interrogations ... I knew they were capable of doing anything to me because I heard what they did to others."[25]

Interrogators also threatened detainees' families with arrest, torture, rape, and murder.[26] Mazen Darwish, a Syrian lawyer and human rights activist, was arrested with his wife.  During his interrogation at AFI Mezzeh, his interrogator asked him what his opinion would be of his wife if the guards raped her in front of him.  Darwish Decl. ¶ 25.  AFI agents often carried out these threats

---

[23] SCM.011 Decl. ¶ 57 (threatened with rape); Al-Kas Decl. ¶ 11; Maatouq Decl. ¶ 10; Awad Decl. ¶ 5; SCM.023 Decl. ¶ 23; SJAC.W004 Decl. ¶ 12–15; SJAC.W005 Decl. ¶¶ 9, 10, 12, 18; Bin Ibrahim Decl. ¶ 27; *see also* Grossman Rep. ¶¶ 29, 34.

[24] Zahlout Decl. ¶ 9; Al-Fakir Decl. ¶¶ 5, 13 (fellow detainees were forced to eat the feces of another detainee); Al-Najjar Decl. ¶¶ 15–16, 30 (another detainee had become paralyzed in his palms due to the severity of the torture); Halema Decl. ¶¶ 4, 6, 21; Hamada Decl. ¶¶ 12, 13, 16; Ahsoon Decl. ¶¶ 9, 25; SCM.011 Decl. ¶¶ 59, 74; Nassar Decl. ¶ 17; Sawan Decl. ¶¶ 12, 15, 26, 30 (witnessed rape of man on the verge of death from severe torture); Quraitem Decl. ¶¶ 10, 18; Buqai Decl.  ¶¶ 8, 11; Al-Kas Decl. ¶¶ 11, 16–17, 31–33; Maatouq Decl. ¶ 16; Al-Barjas Decl. ¶¶ 9, 13; Fares Decl. ¶ 21; Awad Decl. ¶¶ 7, 14, 22, 29–30; Muhiddin Decl. ¶¶ 14–17; SCM.023 Decl. ¶¶ 10, 23, 25, 29–30; Hussein Decl. ¶¶ 19–21; SJAC.W002 Decl. ¶¶ 8, 21–22; SJAC.W004 Decl. ¶ 12; SJAC.W006 Decl. ¶¶ 8–9, 14, 18, 27; Bin Abdullah Decl. ¶¶ 25–26, 64; Bin Ibrahim Decl. ¶¶ 22–23; SJAC.W009 Decl. ¶¶ 20, 34, 49; Hamoud Decl. ¶ 40; *see also* Grossman ¶¶ 32, 35, n.35; Ex. A, ¶ 123.

[25] Al-Qadri Decl. ¶ 40; *see also* Zahlout Decl. ¶ 9 (constant sounds of torture constituted "extreme psychological torture"); Muhiddin Decl. ¶ 14; SJAC.W002 Decl. ¶ 18 ("haunted" by the "unbearable" memory of teen boy's torture); Hamoud Decl. ¶ 41 ("The constant sounds of screams from torture were horrific. I think that this environment was created intentionally by the AFI officers and guards to sow perpetual fear in the detainees.").

[26] Maatouq Decl. ¶¶ 35, 37 (threat to cut off wife's tongue); Awad Decl. ¶ 5 (threat to kill her family); SCM.023Decl. ¶ 23 (threat of sexual violence against family); SJAC.W005 Decl. ¶¶ 9–10, 12; *see also* Grossman Rep. ¶¶ 36–37; Ex. A, ¶ 131.

by arresting detainees' family members, and torturing family members together.[27]  One detainee

heard AFI agents beating and humiliating a wife in front of her husband, while her husband

screamed, until it sounded like he was killed.  SCM.011 Decl. ¶ 74.  Another AFI Mezzeh detainee

said that after his interrogator threatened to cut out his wife's tongue, the regime arrested his wife

and son.  Despite his own torture, his wife and son were "all [he] was concerned about."  Maatouq

Decl. ¶¶ 35–37.  Experts on detention in Syria confirm, and documentation from the U.N. and civil

society organizations shows, that "government forces in Syria, including those at AFI Mezzeh,

routinely [use] threats, humiliation, food deprivation, mock executions, and overcrowded and

unhygienic conditions" to cause severe mental harm.  Pérez-Sales Rep. ¶ 17; *see also id.* ¶¶ 20–

21, 25–34; Grossman Rep. ¶¶ 32–42; Baker and Üngör Rep. ¶¶ 62–65; Ex. A, ¶¶ 61–77.

### E.  AFI Agents Inflicted Gender-Based Violence on Plaintiff

At AFI Mezzeh, AFI agents threatened Plaintiff with rape.  Mzaik Decl. ¶¶ 17, 34.  They

forced Plaintiff to strip naked upon his arrival at AFI Mezzeh, *id.* ¶ 17, and forced him to use the

bathroom wearing only his underwear, *id.* ¶ 21.  Plaintiff describes the resulting intense

humiliation.  *Id.*  Plaintiff witnessed other detainees being tortured while naked.  *Id.* ¶¶ 38–39.

AFI Mezzeh detainees report several forms of rape, including anal rape, rape with objects

and the rape of children, during their detention.[28]  Guards raped one former detainee's mother,

sister, and sister-in-law in front of him and then raped him in front of his family.  Al-Kas

---

[27] Muhiddin Decl. ¶ 6 (her family was arrested and used as leverage during interrogation); Al-Kas
Decl. ¶ 33; Awad Decl. ¶ 22 (husband tortured with iron metal skewer in front of his wife); *see
also* Grossman Rep. ¶¶ 35-36, ¶ 35 n.35, ¶ 36 n.36.
[28] SCM.011 Decl. ¶ 73 (multiple instances of women being raped by guards); Sawan Decl. ¶ 26
(rape of girl in dormitory yard); *see also* SJAC.W004 Decl. ¶¶ 14, 30 (two boys raped with iron
rod until they bled); Al-Kas Decl. ¶ 17 (soldier molested an Iraqi child); Ex. A, ¶ 118 (witness
from Mezzeh reported sexual violence against children).

Decl. ¶ 33.  Guards regularly beat, mutilated, and electrocuted genitals during torture.[29]  Guards threatened detainees with sexual assault,[30] conducted unnecessarily invasive cavity searches[31] and used forced nudity, particularly strip searches, to humiliate detainees.[32]  One former AFI Mezzeh detainee described AFI agents tearing off her clothes with a knife as "the most horrific thing that ever happened to me.  It had a severe psychological impact on me, making me feel helpless and broken."  Zahlout Decl. ¶ 7.

The Assad regime's use of gender-based violence ("GBV")—violence that targets or disproportionately affects individuals because of their gender—to harm detainees was widespread and systematic.  Seif Rep. ¶ 75.  Nearly all detainees across Syrian detention centers report having been subjected to some form of GBV.  *Id.* ¶ 87; Ex. A, ¶¶ 115–18, 124–127.  Government forces regularly used forced nudity, particularly alongside acts causing physical harm, to cause mental suffering that compounded the physical suffering from other acts.  Seif Rep. ¶¶ 78–79, 87–88;

---

[29] SCM.011 Decl. ¶¶ 61, 63 (electrocuted on penis until his penis bled and strapped onto a metal chair with fire underneath such that his buttocks was severely burned); Sawan Decl. ¶ 15; Quraitem Decl. ¶ 8 (hit on "sensitive areas"); SCM.023 Decl. ¶¶ 9, 15 (guards squeezed his testicles and electrocuted his genitals); Bin Abdullah Decl. ¶ 14 (officers electrocuted his genitals); SJAC.W009 Decl. ¶ 40 (hit on genitals); Bulldozer Driver Decl. ¶ 45 (electrocuted on testicles).

[30] SCM.011 Decl. ¶ 57; Al-Kas Decl. ¶ 16 (threatening women with marriage jihad); Muhiddin Decl. ¶ 22 (subjected to sexual harassment through gestures by guards); SJAC.W004 Decl. ¶ 30 (threatened with rape and sexual assault).

[31] Halema Decl. ¶ 7; Hamada Decl. ¶ 7; Ex. A, ¶ 124.

[32] Al-Kas Decl.  ¶¶ 5, 31 (detainee heard woman being ordered to take their clothes off before torture and was stripped [] completely naked and then beat [] in a so-called 'reception party.'"); Fares Decl. ¶ 6 (forced to strip naked and had photos taken, then noted that "[t]hroughout my detention at the [AFI] Branch, I remained stripped of all clothing except my underwear"); SCM.020 Decl. ¶¶ 6, 20 (strip searched and her hijab was thrown into the toilet); Awad Decl. ¶ 6 ("Brigadier General Ahmad Alia was the head of the branch, and he personally searched the detained women and girls in a humiliating, humiliating, and indecent manner."); SJAC.W006 Decl. ¶¶ 7, 11, 14, 31 (witnessed a naked woman being tortured by suspension from her hair); Muhiddin Decl. ¶ 9; SCM.023 Decl. ¶ 20; SJAC.W005 Decl. ¶ 4; Al-Najjar Decl. ¶ 9; Al-Abdullah Decl.  ¶ 5; Halema Decl. ¶ 7; Hamada Decl. ¶ 7; Sawan Decl. ¶ 10; Quraitem Decl. ¶ 13; Buqai Decl. ¶ 6; Bin Ibrahim Decl. ¶ 11; SJAC.W009 Decl. ¶ 10; Darwish Decl. ¶ 20; Ex. A, ¶ 115 (male detainees were detained completely naked).

Grossman Rep. ¶¶ 37–38; Ex. A, ¶¶ 115, 124–126.  Detainees were sexually harassed, assaulted, and raped, often in front of their relatives and other detainees to maximize shame and humiliation. Seif Rep. ¶¶ 93–98; Ex. A, ¶¶ 116–18.

The COI on Syria reports that sexual violence by government forces in Syrian detention centers "formed part of a widespread and systematic attack against the civilian population and amounted to crimes against humanity."  Seif Rep. ¶ 67.  The Assad regime intentionally used GBV to torture detainees.  It leveraged the stigma of sexual assault to cause severe mental pain and suffering, along with the physical pain from this violence.  *Id*. ¶¶ 63–72, 113, 125–29.

### F.  AFI Agents Subjected Plaintiff to Abysmal Detention Conditions

Plaintiff was held in tiny, overcrowded cells at AFI Mezzeh.  Mzaik Decl. ¶¶ 18–19.  He and the other detainees had to sleep on their sides because they could not fit in the cell lying on their backs.  *Id.* ¶ 19.  Given that Plaintiff was held during the height of winter, the cell was freezing.  *Id.* ¶¶ 20, 22.  It was infested with ticks, lice, and other insects.  *Id.* ¶ 22.  AFI agents did not allow Plaintiff or other detainees to shower, and the odor from their untreated wounds and the filthy cells was revolting.  *Id.*  The lack of light, air, and heat, along with overcrowding, poor hygiene, and insects, resulted in rampant disease.  *Id.*  Plaintiff's skin developed red, itchy patches that drove him "mad."  *Id.*  AFI agents did not permit him to access medical care and whipped one detainee who dared to ask for medication.  *Id.* ¶ 23.  Plaintiff believes that these conditions were deliberately maintained to punish the detainees.  *Id*. ¶ 22.

AFI agents forced Plaintiff to share a single cup of water with his cellmates and provided very small quantities of food.  *Id.* ¶ 25.  Plaintiff lost significant weight while in detention, and the flesh in his face looked like it had been "sucked out."  *Id.*  He also contracted hepatitis.  *Id.* ¶ 47.

Other former detainees at AFI Mezzeh similarly described cells that were overcrowded,[33] unhygienic;[34] and infested with lice, cockroaches, and scabies,[35] and had extreme temperatures.[36] The stench in the cells was putrid, but detainees were rarely permitted to shower.[37]  Deliberately depriving detainees of food and water was a common practice.[38]  Detainees reported being forced to eat food that guards urinated on or that was infested with insects.[39]  While illnesses such as

---

[33] Zahlout Decl. ¶ 8; Al-Fakir Decl. ¶ 3; Al-Najjar Decl. ¶ 11, 13, 23; Al-Abdullah Decl. ¶¶ 6, 16, 22 (cell was so small that they had to sleep in shifts because there wasn't enough room to lie down); Halema Decl. ¶¶ 10, 18–19 (10m x 3m cell contained 125 detainees); Hamada Decl. ¶¶ 8, 11 (40 square meters with 120 detainees); Al-Saadi Decl. ¶¶ 10, 24–27; Ahsoon Decl. ¶¶ 13, 22; SCM.011 Decl. ¶ 50, 71; Nassar Decl. ¶¶ 13, 16, 18–19; Sawan Decl. ¶¶ 12, 17; Quraitem Decl. ¶¶ 12–13, 20; Al-Kas Decl. ¶ 5; Maatouq Decl. ¶¶ 9–10; Al-Barjas Decl. ¶ 4; Fares Decl. ¶ 8; SCM.020 Decl. ¶ 20; Awad Decl. ¶¶ 19–20; Muhiddin Decl. ¶¶ 27; SCM.023 Decl. ¶ 7;  Hussein Decl. ¶¶ 12–13, 17; SJAC.W002 Decl. ¶ 6; Al-Najjar Decl. ¶¶ 13, 24; SJAC.W004 Decl. ¶ 9; SJAC.W005 Decl. ¶ 11; SJAC.W006 Decl. ¶ 23; Bin Abdullah Decl. ¶¶ 4, 21, 39; Bin Ibrahim Decl. ¶ 13; SJAC.W009 Decl. ¶ 24; Hamoud Decl. ¶ 23.

[34] Al-Fakir Decl. ¶ 6; Halema Decl. ¶ 16; Muhiddin Decl. ¶ 19 (walls and floor awash with feces); SJAC.W006 Decl. ¶ 24 (cell was full of decaying corpses and worms); SJAC.W009 Decl. ¶ 30 (corridors were filled with 2 inches of urine); Hamoud Decl. ¶ 37.

[35] Al-Fakir Decl. ¶ 6; Al-Abdullah Decl. ¶ 29; Al-Kas Decl. ¶ 39; SCM.020 Decl. ¶ 22; SJAC.W002 Decl. ¶ 16; SJAC.W009 Decl. ¶ 45; Ahsoon Decl. ¶ 17; Fares Decl. ¶ 21.

[36] SCM.023 Decl. ¶ 20; Bin Abdullah Decl. ¶ 63 (bitter cold resulted in sickness and death); SJAC.W009 Decl. ¶ 30; Hamoud Decl. ¶ 37 (describing the winters as "brutally cold").

[37] Al-Abdullah Decl. ¶ 14 (allowed to shower only once in roughly a year with no soap); Ahsoon Decl. ¶ 17 (no showering allowed); Fares Decl. ¶ 21; Hussein Decl. ¶ 21; SJAC.W002 Decl. ¶ 19 (cellmate's oozing infection emanated odors that made the cell smell of a dying animal).

[38] Al-Najjar Decl. ¶¶ 14, 25; Al-Abdullah Decl. ¶¶ 25, 30; Halema Decl. ¶ 20; SCM.011 Decl. ¶¶ 35, 53 (rampant malnutrition); Sawan Decl. ¶ 31; Al-Kas Decl. ¶ 17; Maatouq Decl. ¶ 21; Al-Barjas Decl. ¶ 7; Fares Decl. ¶¶ 11, 26 ("my body was extremely emaciated"); Awad Decl. ¶ 15; Muhiddin Decl. ¶ 23 (food was full of bugs); SCM.023 Decl. ¶¶ 16, 22 (one liter of water shared among 14 detainees; at one point he was so dehydrated he tried to suck water from his wounds); SJAC.W006 Decl. ¶¶ 19, 28, 32 (deprived of food for many days at a time and detainees became "skeletons"); Bin Abdullah Decl. ¶ 5; Bulldozer Driver Decl. ¶ 37 (the bodies he buried were emaciated); Ex. A, ¶ 72.

[39] SJAC.W004 Decl. ¶ 19 (guards would urinate on cell floor and make detainees eat bread soaked with their urine); Awad Decl. ¶ 27; Muhiddin Decl. ¶ 23.

diarrhea and scabies were rampant,[40] denial of medical care was near-universal.[41]  After torture, "[d]etainees were brought back to their cells by the guards with open wounds, swollen limbs, hemorrhaging and left without medical care."  Baker and Üngör Rep. ¶ 52 n.28.  One detainee described the conditions as "extreme psychological torture."  Zahlout Decl. ¶ 9.  "[T]he pattern of inhumane conditions inflicted on detainees was intentional, systematic, and intended to punish, intimidate, coerce, and discriminate against them," Ex. A, ¶ 61, and had a "yearslong, if not permanent, impact on the lives of surviving detainees," *id.* ¶ 97.

### G.  Many Detainees Were Murdered or Forcibly Disappeared at AFI Mezzeh

Plaintiff was released from AFI Mezzeh on January 25, 2012.  Mzaik Decl. ¶ 44.  He later learned that family members had discovered where he was being held through informal channels and had paid money for his release to high-ranking Syrian officials through an intermediary.  *Id.* Major General Hassan, the then-head of AFI who now faces war crimes charges in the United States, *supra* p. 6, initially refused the intermediary's request to pay for Plaintiff's release, stating that Plaintiff would "die in that prison" and that he was among those "whose life we need to wipe out."  Mzaik Decl. ¶ 45.  Following a second attempt by the intermediary, Hassan agreed to

---

[40] *See* SJAC.W009 Decl., ¶¶ 30, 46 (contracted scabies); *see also* Hamoud Decl. ¶ 59 (contracted tuberculosis in detention); Ex. A, ¶ 75 (explaining that poor hygiene and rotten food led to diarrhea, which caused many deaths when left untreated).

[41] Al-Fakir Decl. ¶ 13 (widespread torture in detention hospital led to death of at least one detainee); Al-Abdullah Decl. ¶¶ 25, 29; Al-Saadi Decl.  ¶¶ 22–23 (beaten in the hospital); Ahsoon Decl. ¶ 17; SCM.011 Decl. ¶ 78 (the hospital was a "human slaughterhouse rather than a hospital" as "most detainees were tortured and killed there"); Al-Kas Decl. ¶¶ 41–48 (tortured while hospitalized and saw a doctor murder a sick detainee); Maatouq Decl. ¶¶ 26–38 (beaten in the hospital and almost had his leg amputated); Al-Barjas Decl. ¶ 14 (medical care denied to a man who broke his hand); Fares Decl. ¶ 21 (diabetics denied insulin); Awad Decl. ¶ 27 (dead person in her hospital room); Muhiddin Decl. ¶ 21 (no medical care except cetamolol pills); SJAC.W002 Decl. ¶¶ 9, 17 (denied insulin at first, and then given one dose with a dirty needle); Bin Abdullah Decl. ¶¶ 61–63 (deaths due to untreated infection); Hamoud Decl. ¶ 37 ("Sometimes officers would bring the very sick a pill which they said was aspirin."); Sawan Decl. ¶ 33; Buqai Decl. ¶ 11.

Plaintiff's release in exchange for a payment. *Id.* ¶ 46. After his release, Plaintiff fled to the United States, where he now resides. *Id.* ¶ 48.

While Plaintiff survived, the fate of many detainees is unknown. Most detainees, including Plaintiff, were not formally charged with a crime, allowed to seek legal representation, or allowed to contact family members or friends after their arrest. Duhaime Rep. ¶¶ 21, 23–24; *see, e.g.*, Mzaik Decl. ¶ 43; Nassar Decl. ¶ 25. The Assad regime had no system of public records showing the whereabouts of detainees, and detention was often accompanied by a "complete refusal on the part of the Syrian authorities to disclose information about the fate or whereabouts of the concerned person, or even to acknowledge their existence." Duhaime Rep. ¶ 23. Detainees' family members often "do not know where their relatives are held, what they are accused of, when they will be released, and if they are dead or alive." Seif Rep. ¶ 35. Although thousands of prisoners were released after the fall of the Assad regime, at least 100,000 people remain missing and disappeared at the time of this filing.[42]

Given the Assad regime's refusal to disclose information about the detained individuals, many detentions were equivalent to "enforced disappearances." Duhaime Rep. ¶¶ 15, 23–25. The former Chair of the U.N. Working Group on Enforced or Involuntary Disappearances highlighted the "robust and consistent documentation over the course of many years indicating that Syria [was] systematically perpetrating enforced disappearances at a large scale, facilitated by the Syrian Armed Forces and Syrian security services." *Id.*, Sec. II.A. Given the severity of the issue, the U.N. General Assembly established a new mechanism in 2023 specifically to address enforced disappearance and detention in Syria. U.N. G.A. Res. 77/301 (July 5, 2023).

---

[42] *See* Kara Eyrich, Advisor for the Third Committee, U.S. General Comment at UNGA 79 adoption of Third Committee resolution on the situation of human rights in the Syrian Arab Republic (Dec. 17, 2024), https://perma.cc/SKG2-7ZEU.

Many of those forcibly disappeared are presumed to have died in detention. Conservative estimates are that "tens of thousands" of individuals have died while in custody of government agencies since 2011. Seif Rep. ¶ 114. AFI Mezzeh detainees recounted how fellow detainees routinely died during or after the severe torture inflicted on them by AFI agents, including because of strangulation, blunt-force trauma, suffocation, broken necks, burns, and gangrene.[43] Detainees' testimonies are corroborated by photographic proof. The "Caesar" photographs (which were taken between May 2011 and August 2012 and smuggled out of Syria by a photographer for the Syrian military police code-named "Caesar") depict at least 6,786 individuals who died in detention, many of whom show "obvious signs of torture and abuse, including blunt injuries, indications of suffocation, removal of fingernails, signs of extensive skin diseases, bondage marks on wrists, and severe emaciation." Ex. A, ¶¶ 14, 167, 342. These photos show that the AFI facilities in Damascus, which are predominantly concentrated at AFI Mezzeh, accounted for the third-highest number of deaths across all intelligence branches. Baker and Üngör Rep. ¶ 70 n.47. "As the number of persons dying in Government detention increased, it strained the Government's capacity to deal with the bodies," and bodies began to "pil[e] up" and disintegrate. Ex. A, ¶¶ 353–54.

AFI officials took active steps to conceal the scale of deaths at AFI Mezzeh and across other regime detention centers by "falsifying death records and secreting their remains into mass graves." Ex. A, ¶¶ 296, 358–64. Under the supervision of AFI officers, from 2011 to 2018, "the

---

[43] Al-Fakir Decl. ¶ 13 (death from torture); SCM.011 Decl. ¶ 58 (death from blunt force object); Sawan Decl. ¶¶ 12, 15, 27–29 (witnessed multiple deaths and prison was filled with odor of rotting and burning corpses); Al-Kas Decl. ¶ 27, 45, 47 (death from wheel torture, breaking detainees' necks, and kicking to the head); SJAC.W004 Decl. ¶ 13 (death from kicking); SJAC.W006 Decl. ¶¶ 23–25, 30 (saw a room used to store corpses); Bin Abdullah Decl. ¶¶ 61–64 (death from untreated infection); Hamoud Decl. ¶ 48, 50 ("On average, one person in my cell would die everyday."); Maatouq Decl. ¶ 16; Awad Decl. ¶¶ 29–30; Muhiddin Decl. ¶ 16; SCM.023 Decl. ¶¶ 10, 23; Halema Decl. ¶ 17; SJAC.W005 Decl. ¶ 24; *see also* Baker and Üngör Rep. ¶ 52 n.28.

Gravedigger" (a witness using a pseudonym) coordinated secret burials of corpses in unmarked mass graves of those killed by, or who died in the custody of, the regime. Gravedigger Decl. ¶¶ 4–9, 14–38. Many of the bodies that the Gravedigger received were marked with the Arabic letter "ح" (the first letter of "Air Force"), indicating that the body had come from AFI. *Id.* ¶ 29; *see also* Baker and Üngör Rep. ¶ 11 n. 2 (noting similar markings on corpses in the Caesar photos). A former bulldozer driver also buried thousands of bodies in unmarked mass graves under the supervision of AFI officials. Bulldozer Driver Decl. ¶¶ 3–4, 27–30. Both men saw bodies, including of women and children, that bore visible signs of torture. *Id.* ¶ 33, 36–37; Gravedigger Decl. ¶ 17, 30.

## PROCEDURAL HISTORY

On January 7, 2022, Plaintiff filed this lawsuit against Syria under the FSIA, 28 U.S.C. § 1605A(c), seeking damages and other relief for his torture at the hands of the Syrian government. *See* Dkt. 3. Plaintiff also filed an offer to arbitrate. *Id.* Because the first two methods of service under 28 U.S.C. § 1608(a)(1), (2) are inapplicable, Plaintiff filed an affidavit requesting foreign mailing under § 1608(a)(3) on May 20, 2022. Dkt. 20. He could not effect service by mail "within 30 days" under § 1608(a)(3). Dkt. 22. He therefore initiated service through diplomatic channels under § 1608(a)(4). Dkt. 23. Service through diplomatic channels was effected on Syria on February 8, 2023, in accordance with 28 U.S.C. § 1608(a)(4). Dkt. 30. Under 28 U.S.C. § 1608(c)-(d), Syria's answer or other responsive pleading was due by April 9, 2023. Dkt. 32. Syria filed nothing. On May 11, 2023, the Clerk of Court entered default against Syria. Dkt. 33. Plaintiff now asks the Court to enter a default judgment as to liability and award Plaintiff damages.

## LEGAL STANDARD

Under the FSIA, this Court may enter default judgment against Syria if it deems that

Plaintiff has established his claim "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). The Court may consider any admissible evidence and take as true any "[u]ncontroverted factual allegations that are supported by [that] evidence." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). Such evidence includes sworn declarations and expert reports, *see e.g., Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 159 (D.D.C. 2019), as well as U.N. or other intergovernmental reports, *see, e.g.*, *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 129 (D.D.C. 2021); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1481–83 (D.C.Cir.1991). Courts may exercise wide discretion and adjust "the standard of proof in FSIA default judgment actions," such as the present action under the FSIA's terrorism exception, to be "more lenient." *Mueller v. Syrian Arab Republic*, 656 F. Supp. 3d 58, 72 (D.D.C. 2023). Accordingly, courts may admit at the default judgment stage evidence not ordinarily admissible at trial to help achieve the purpose of the terrorism exception, which is "to prevent state sponsors of terrorism ... from escaping from liability for their sins." *Kim*, 774 F.3d at 1048–49.

## ARGUMENT

### I.    The Court Has Subject-Matter and Personal Jurisdiction

#### A. The Court Has Subject-Matter Jurisdiction Because Syria Is Not Entitled to Immunity for Torturing Plaintiff

The FSIA grants U.S. district courts "original jurisdiction without regard to amount in controversy of any [1] nonjury civil action [2] against a foreign state ... [3] as to any claim for relief in personam ... [4] with respect to which the foreign state is not entitled to immunity[.]" 28 U.S.C. § 1330(a). All four requirements for subject-matter jurisdiction are met here. First, Plaintiff has not demanded a jury trial and does not claim to be entitled to one here. *See Croesus*

*EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002) ("[C]laims under the FSIA are not eligible for resolution by a jury ...."). Second, his action is against Syria, a foreign state. Third, he seeks in personam relief. Compl. ¶ 7. Fourth, as explained below, Syria lacks immunity under the FSIA's terrorism exception, which strips sovereigns of their immunity when, as here, a plaintiff seeks "money damages ... for personal injury or death that was caused by" violations of international law, including "torture." 28 U.S.C. § 1605A(a)(1).

The FSIA terrorism exception requires a court to "hear a claim" if (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act ... and ... remains so designated when the claim is filed"; (2) "the claimant or the victim was, at the time [of] the act[,] ... a national of the United States"; and (3) "the act occurred in the foreign state against which the claim has been brought, [and] the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(i)-(iii).  Plaintiff satisfies these conditions.[44]

First, Syria is a foreign state that was designated a state sponsor of terrorism at the time of Plaintiff's detention and torture at AFI Mezzeh starting on January 10, 2012 and when Plaintiff filed his claim on January 7, 2022.  28 U.S.C. § 1605A(h)(6) (defining a state sponsor of terrorism as "a country the government of which the Secretary of State has determined ... is a government that has repeatedly provided support for acts of international terrorism").  Syria has been designated as a state sponsor of terrorism since December 29, 1979.  *See* 45 Fed. Reg. 33955.[45]

---

[44] While timeliness is an affirmative defense which Syria has not raised, this action was commenced less than 10 years after the date on which the cause of action arose.  *See* 28 U.S.C. § 1605A(b); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114–5 (D.C. Cir. 2019) (holding that § 1605A(b)'s limitations period is non-jurisdictional).

[45] Even if, following the fall of the Assad regime, Syria is removed from the list of state sponsors of terrorism, the removal would not deprive this Court of jurisdiction over pending litigation.  The FSIA's exclusive focus is on whether the state was a designated state sponsor of terrorism at the time of the conduct at issue and when the claim was filed. 28 U.S.C. § 1605A(a)(2)(A)(i)-(ii); *see*

This matter continues against the government of Syria, even though Assad is no longer in power. *See, e.g.*, *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) (considering FSIA claims against Germany arising out of "the predecessor government of the Third Reich").

Second, Plaintiff is a U.S. citizen, and was a U.S. citizen at the time when he was detained and tortured at AFI Mezzeh.  *See supra* p. 6.  U.S. citizens are nationals for FSIA purposes.  *See* 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

Third, Plaintiff afforded Syria a reasonable opportunity to arbitrate the claim.  Plaintiff included an Offer to Arbitrate with his summons and complaint.  *See supra* p. 20; *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233–34 (D.C. Cir. 2003) (holding FSIA "does not require any particular form of offer" and that offer made after service of complaint afforded a reasonable opportunity to arbitrate).  Syria has failed to respond to the offer. Because each of the FSIA's terrorism exception's three preconditions are met, the Court has "original jurisdiction" over this action. 28 U.S.C.§ 1330(a).

## B. This Court has Personal Jurisdiction over Syria Because Subject-Matter Jurisdiction Exists and Syria Has Been Properly Served

This Court has personal jurisdiction over Syria because, as set forth above in Part III, service was effected in accordance with the FSIA's requirements.  *See* 28 U.S.C. § 1330(b); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) ("Personal jurisdiction over foreign states exists as long as the Court can exercise original jurisdiction under 28 U.S.C.

---

*also* David P. Stewart, *The Foreign Sovereign Immunities Act: A Guide for Judges* (2018), p. 111 ("The removal of a state from the list of designated state sponsors does not automatically result in the termination of pending litigation against that state").  Rather, specific legislation is required to deprive the Court of jurisdiction over a pending otherwise-valid claim under the FSIA terrorism exception.  *See Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009) (upholding Presidential authority, exercised pursuant to legislation, to make the terrorism exception to immunity inapplicable to Iraq and depriving the courts of jurisdiction over then-pending related actions).

§ 1330(a) and service of process meets the standards set forth by 28 U.S.C. § 1608.").

## II. Syria is Liable for Torturing Plaintiff

Syria is liable to a U.S. national for cases "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture ... by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The record here overwhelmingly proves Syria's liability for Plaintiff's torture.

### A. AFI Agents Tortured Plaintiff During His Detention

AFI agents' abuse of Plaintiff constitutes "torture" under the FSIA. The FSIA incorporates the Torture Victims Protection Act's ("TVPA's") definition of torture. *See* 28 U.S.C. § 1605A(h)(7) (citing 28 U.S.C. § 1350 note). The TVPA defines torture as any act (1) "directed against an individual in the offender's custody or physical control," (2) that intentionally inflicts "severe pain or suffering" whether physical or mental, (3) for purposes of obtaining information, intimidation, punishment, or discrimination. 28 U.S.C. § 1350 note § 3(b)(1) (1992). The TVPA definition, in turn, draws on Article 1 of the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT"). *See* Grossman Rep. ¶¶ 22–23.

### i. AFI Agents Detained Plaintiff Under Their Custody and Physical Control

The FSIA requires offenders to have "custody or physical control" over the plaintiff at the time the severe pain or suffering is inflicted. *Kim*, 774 F.3d at 1045. After being detained at Damascus International Airport, Plaintiff was funneled through various Syrian security services' branches before being transferred to AFI custody at AFI Mezzeh on January 10, 2012. *Supra* p. 7. At all relevant times, Plaintiff was in the custody and physical control of AFI agents until his release from AFI Mezzeh on January 25, 2012. *Supra* pp. 6–20. Judges in this District have

regularly found the elements of torture, including custody or physical control, to be satisfied where, as here, the severe pain and suffering was inflicted during arrest and detention. *See, e.g.*, *Kim*, 774 F.3d at 1045, 51; *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 176 (D.D.C. 2019).

> ## ii. AFI Agents Intentionally Inflicted Severe Pain and Suffering on Plaintiff During His Detention

For an act to qualify as torture, a perpetrator must have intentionally inflicted severe pain or suffering, which can be physical or mental. 28 U.S.C. § 1350 note § 3(b)(1). While Plaintiff was detained at AFI Mezzeh, AFI agents intentionally carried out numerous acts that caused Plaintiff severe pain and suffering. Many of these acts involved both severe physical and mental suffering, which independently and cumulatively meet the severity requirement for torture under the TVPA—and thus the FSIA.

> ### a. AFI Agents Brutally and Repeatedly Physically Beat Plaintiff During His Detention

Torture comprises "extreme, deliberate and unusually cruel practices, for example, sustained systematic beating." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002) (quoting S. Exec. Rep. No. 101-30, at 14 (1990)). A court may assess the severity of a physical attack based on "details about the nature of the" beatings, such as "their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out." *Id.* at 93. District courts applying similar principles have determined that "severe beatings" constitute torture. *See, e.g.*, *Massie v. Gov't of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 66–67, 74 (D.D.C. 2008); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 91–92, 97 (D.D.C. 2003); *see also* Grossman Rep. ¶ 30 (finding the same under the CAT).

As explained above, AFI agents intentionally inflicted severe pain and suffering on Plaintiff through sustained and systematic beatings: they slapped Plaintiff, strangled him, punched him in the face hundreds of times, kicked him all over his body, and beat him on trips to the filthy bathroom. *Supra* pp. 8–10. They struck him with objects, beating him with a stick, whipping him with a hose, and hitting him with a PVC pipe on the soles of his feet until he could no longer stand. These beatings were intended to and did cause Plaintiff severe pain and suffering. *Supra* pp. 8–10; *see* Grossman Rep. ¶¶ 27–28, 30–31 (finding that the acts caused severe physical pain).

### b. AFI Agents Intentionally Inflicted Severe Mental Pain and Suffering on Plaintiff

The TVPA defines "mental pain or suffering" as prolonged harm caused by or resulting from: "[a] the intentional infliction or threatened infliction of severe physical pain or suffering; ... [b] the threat of imminent death; or [c] the threat that another individual will imminently be subjected to death, severe physical pain or suffering." 28 U.S.C. § 1350 note §3(b). AFI agents intentionally subjected Plaintiff to each of these types of acts, which caused him severe mental pain and suffering.

*The intentional infliction or threatened infliction of severe physical pain or suffering*. AFI agents beat Plaintiff, stripped him naked, threatened him with electrocution and sexual assault, and told him that he would be hung by his handcuffed wrists in positions that cause extreme pain. Interrogators subjected him to relentless threats, false accusations, and psychological abuse. As a result, Plaintiff suffered intense mental anguish at the threat that his torture would resume, or worse, that he would be executed. *Supra* pp. 8–13.

*The threat of imminent death*. Upon his arrival at AFI Mezzeh, an AFI agent threatened to kill Plaintiff and tried to strangle him to death. *Supra* p. 10. Courts have regularly found that death threats against detainees in environments rife with torture were "imminent" and cause severe

"mental pain and suffering" constituting torture. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 203 (D.D.C. 2017); *see also Kilburn*, 699 F. Supp. 2d at 152 (holding mock executions constituted torture); *Massie*, 592 F. Supp. 2d at 66, 74 (holding detainees were tortured when they were subjected to "individual threats of death"); *Regier*, 281 F. Supp. 2d at 92, 97 (same); *Price v. Socialist People's Libyan Arab Jamahiriya*, 274 F. Supp. 2d 20, 25 (D.D.C. 2003), *aff'd in part*, 389 F.3d 192 (D.C. Cir 2004) (same); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 152–53, 160–61 (D.D.C. 2017) (finding a death sentence in a sham trial constituted torture); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1251–52 (11th Cir. 2005) (holding that telling plaintiffs to "giv[e] their last messages" and that a member of the security forces "wanted to take a clear photo of their faces before he killed them" constituted torture).

*The threat that another individual will imminently be subjected to death, severe physical pain or suffering*. Plaintiff was interrogated alongside his cousin and forced to listen to his torture in an attempt to force Plaintiff to confess to anti-regime activities. *Supra* pp. 10–13. Plaintiff was forced to walk past detainees hung by their wrists in the hallway in the *shabeh* position, and listen to the screams of other detainees being beaten, electrocuted, and scalded with boiling water. For Plaintiff, the mental pain and suffering of seeing and hearing the torture of other detainees was "horrific" and "long-lasting." *Supra* pp. 10–13. This was a *modus operandi* of the Assad regime—it regularly forced detainees to witness the torture of their loved ones or other prisoners. *Supra* pp. 10–13. Every time Plaintiff witnessed this torture, he knew that he could be next. *Supra* pp. 10–13. The UN Special Rapporteur on torture and other cruel, inhuman, or degrading treatment has found that hearing the torture of other detainees, in combination with the continuous threats of torture, creates a "torturing environment" and "atmosphere of fear," which amounts to psychological torture. *See* Grossman Rep. ¶ 36; *see also* Pérez-Sales Rep. ¶¶ 20–24, 35.

The mental anguish that Plaintiff suffered from witnessing abuse and threats to a relative also constitutes torture. *See, e.g.*, *Doe v. Qi*, 349 F. Supp. 2d 1258, 1318 (N.D. Cal. 2004) (finding torture where plaintiff was forced to "witness the guards' severe mistreatment of a close friend"); *Jaramillo v. Naranjo*, 2014 WL 4898210, at *14 (S.D. Fla. Sept. 30, 2014) (finding torture when plaintiff witnessed a relative be shot and bleed to death). Moreover, severe mental suffering from witnessing the death, physical abuse, or threats to abuse other, unrelated prisoners may also constitute torture, as it does here. *See, e.g.*, *Price*, 274 F. Supp. 2d at 25 (finding mental torture where victim was "forced to watch on three separate occasions as fellow prisoners were beaten, one of whom was beaten to death"); *Massie*, 592 F. Supp. 2d at 66, 74 (holding detainees were tortured when they were subjected to threats to kill others); *Hekmati*, 278 F. Supp. 3d at 153, 160–61 (finding torture where plaintiff witnesses fellow prisoners being "dragged out of cells for execution or beatings").

### c. Abysmal Conditions of Detention at AFI Mezzeh Caused Plaintiff Severe Physical and Mental Pain and Suffering

Nearly a quarter century ago, a court in this District recognized that detaining prisoners for days "with no water, no toilet and no bed" was a "deprivation of basic human necessities" that caused the prisoners severe pain and suffering and was thus "more than enough to meet the definition of 'torture.'" *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 45 (D.D.C. 2000). Since then, courts have repeatedly held that captors have inflicted torture on prisoners by providing "unsanitary conditions [and] inadequate food and medical care." *Kilburn*, 699 F. Supp. 2d at 152; *see also Rezaian*, 422 F. Supp. 3d at 177 (noting detainee was held hostage in "unsanitary conditions and solitary confinement" and "provided inadequate food and medical care"); *Massie*, 592 F. Supp. 2d at 66, 74 (holding detainees were tortured where they were "provided inadequate rations of food and forced to live in unsanitary conditions"); *Regier*, 281 F.Supp.2d at 91, 97

(finding victim was "tortured" when he was kept in "deplorable and inhumane conditions"); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 45 (D.D.C. 2001) (concluding that "the deprivation of adequate food, light, toilet facilities, and medical care for over six years amounts to torture"); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (determining victim who was incarcerated "in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities" experienced torture).

As in those cases, this Court should conclude that Plaintiff's conditions of confinement caused him severe physical and mental suffering. Plaintiff was kept in an overcrowded, unheated, insect-infested cell, not permitted to shower, and not provided with medical care. *See supra* pp. 15–17. In addition to the physical suffering from overcrowding, starvation, freezing, hepatitis, and rashes, he suffered psychological terror from the conditions of detention, and wished for his own death so that he would no longer have to endure the misery of his detention. *See* Grossman Rep. ¶¶ 39–42 (finding that detention conditions inflicted upon Plaintiff could amount to torture under the CAT); *see also* Pérez-Sales Rep. ¶ 39. The Assad regime intentionally created this torturing environment to cause AFI detainees, including Plaintiff, severe physical and mental suffering. *See supra* pp. 10–13, 15–17.

### iii. AFI Agents Deliberately Inflicted Severe Pain and Suffering on Plaintiff for Proscribed Purposes

For acts to qualify as torture, "a foreign state must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end." *Price*, 294 F.3d at 93. To constitute torture, an act may be committed "for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual ... intimidating or coercing that individual or a third person, or for any reason based on discrimination

of any kind." 28 U.S.C. § 1350 note 3(b)(1).  This list is not exhaustive; it merely "illustrate[s] the common motivations" of torturers. *Price*, 294 F.3d at 93.

AFI agents committed these grievous violations in order to force Plaintiff to confess to anti-regime activities, threatening him with further torture, or death, if he refused to confess.  They attempted to extract information about Plaintiff's family and friends, as well as his supposed anti-regime activities. *Supra* pp. 8–10; Mzaik Decl. ¶¶ 32–33.  The Assad regime systematically tortured detainees to obtain confessions. Grossman Rep. ¶¶ 44–45; Ex. A, ¶¶ 30, 134–42, 329–39.

The Assad regime intentionally implemented a systematic campaign of torture against Plaintiff (and other detainees) as part of its policy to intimidate and punish actual or potential opponents of the regime.  Grossman Rep. ¶¶ 46–47.  The D.C. Circuit has recognized that one of the purposes of torture may also be to "deter dissent in the larger population." *Kim*, 774 F.3d at 1050.  The regime's widespread use of arrests, detention, torture, and murder was a "State policy, to instill fear and to intimidate and terrorize [the] civilian population," where potential opponents knew that they put themselves, their family, and their community at risk with their activism. Grossman Rep. ¶ 49 (alteration in original); *see* Duhaime Rep. ¶ 22.

### B.  The AFI Agents Who Tortured Plaintiff Were Officials, Employees, or Agents of Syria

Plaintiff's injuries were caused by acts carried out by a "foreign state, or an official, employee, or agent of that foreign state." 28 U.S.C. § 1605A(c).  Plaintiff was arrested by Syrian state agents at the Damascus International Airport before ultimately being transferred to the custody of AFI agents at AFI Mezzeh on January 10, 2012.  There, he was detained, interrogated and tortured by AFI agents.  Following payments to Major General Hassan, the head of the AFI, to secure his release, Plaintiff was released on January 25, 2012 on orders of Brigadier General Mahmoud, the head of AFI Mezzeh. *Supra* pp. 17–18; *see also* Mzaik Decl. ¶ 46.

At all relevant times, AFI agents acted within the scope of their office, employment, or agency, and at the behest and under the operational control of the government of Syria. In fact, these agents acted in accordance with a Syrian government policy to arrest, detain, interrogate, and torture perceived opponents of the Assad regime. *Supra* pp. 4–6.

Plaintiff's torture is thus directly attributable to the Syrian state. Courts have regularly held States liable under the FSIA for torture committed by state operatives in state-run detention facilities. *See, e.g.*, *Dawes v. Syrian Arab Republic*, 2023 WL 8529288, *1 (D.D.C. Dec 8, 2023) (holding Syria liable for the detaining and torturing a U.S. citizen in a Syrian Military Intelligence facility); *Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 81 (D.D.C. 2021) (holding Iran liable for detaining a U.S. national in Iranian prison); *Kim*, 774 F.3d at 1045 (holding North Korea liable for torture and extrajudicial killing carried out by state operatives).

### C. Syria Caused Personal Injury to Plaintiff

To prove that Syria "caused" "personal injury" under 28 U.S.C. § 1605A(c), Plaintiff must prove a theory of liability, generally civil tort liability based on "general principles of tort law." *Colvin*, 363 F. Supp. 3d at 155–56. Courts regularly look to "state decisional law, legal treatises, or the Restatements" to determine the "general principles of tort law" that govern FSIA claims. *Id.* at 156. Here, Syria is liable to Plaintiff for false imprisonment, battery, assault, and intentional infliction of emotional distress ("IIED").

### i.    Syria Is Liable for False Imprisonment

False imprisonment occurs "when one person '(a) acts intending to confine the other ... within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.'" *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342–43 (D.D.C. 2016) (quoting Restatement

(Second) of Torts § 35 (1965)).  Foreign governments have regularly been held liable for false imprisonment for detaining individuals in state-run detention facilities.  *See Saberi*, 541 F. Supp. 3d at 81 (holding Iran committed false imprisonment for detaining a U.S. national in Iranian prison); *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 133 (D.D.C. 2019) (same).  Syrian government agents intended to and actually confined Plaintiff from the time of his detention at Damascus International Airport through his transfer to and detention at AFI Mezzeh. Plaintiff was aware of his detention and suffered and continues to suffer physical, emotional, and psychological harm as a result.  *Supra* pp. 6–17.  Those acts constitute false imprisonment.

### ii.    Syria Is Liable for Battery and Assault

Battery is "an act 'intending to cause [and resulting in] a harmful or offensive contact with ... [another person], or an imminent apprehension of such a contact.'"  *Saberi*, 541 F. Supp. 3d at 82 (quoting Restatement (Second) of Torts § 18 (1965)) (first alteration added).  Any "bodily contact is offensive if it offends a reasonable sense of personal dignity."  *Id.* (quoting Restatement (Second) of Torts § 19 (1965)).  Assault "occurs when one person (a) 'acts intending to cause a harmful or offensive contact with the person of the other ... or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension.'"  *Stansell*, 217 F. Supp. 3d at 343 (quoting Restatement (Second) of Torts § 21(1) (1965)).

Acts of torture like those Plaintiff suffered, including brutal slapping, choking, beating, kicking, and whipping, are "undeniably" battery.  *Abedini*, 422 F. Supp. 3d at 133; *see also Stansell*, 217 F. Supp. 3d at 342 ("[T]he acts of physical torture ... were direct, intentional, harmful contacts.");  *Sutherland*, 151 F. Supp. 2d at 48 (finding battery when captor beat hostage).  Other acts that Syria committed, such as arresting Plaintiff, forcing him to strip naked, conducting invasive and unnecessary searches, and keeping him in inhumane conditions, undermined

Plaintiff's personal dignity, and many were harmful—leading to hepatitis and malnutrition. *See Saberi*, 541 F. Supp. 3d at 82 (concluding forcible arrest and strip search constitutes battery).

As detailed above, Syrian government agents subjected Plaintiff to an organized and strategic campaign of physical and psychological torture that they intended to cause fear of imminent death or severe harm, and which actually caused him severe mental trauma. *Supra* pp. 4–20. Threatening torture and death is a quintessential case of assault. *Stansell*, 217 F. Supp. 3d at 343 (finding "imminent apprehension of death" when victims "tortured ... with mock executions and visible preparations to kill them"); *Saberi*, 541 F. Supp. 3d at 82 (holding threats of death and physical harm constituted assault).

### iii.    Syria Is Liable for IIED

IIED is "extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46 (1965)). Liability for IIED attaches when the extreme and outrageous conduct was directed at the plaintiff. *Id.* Syria is also liable for conduct directed at a third party while the plaintiff was "present at the time," if the conduct causes the plaintiff "severe emotional distress" which "results in bodily harm." *Id.*

"Torture, by definition, involves 'extreme and outrageous' conduct." *Abedini*, 422 F. Supp. 3d at 133 (finding IIED where guards threatened detainee and his family with death and denied him medical care). Torture is "intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). AFI agents engaged in extreme and outrageous conduct by detaining and torturing Plaintiff, causing Plaintiff to suffer extreme mental and physical anguish and pain, and to fear for his life. *Supra* pp. 6–17. AFI agents also engaged

in extreme and outrageous conduct by torturing other detainees in Plaintiff's presence, causing Plaintiff extreme mental suffering, which led to bodily harm. *Supra* pp. 10–13. Indeed, the Assad regime intended for the torturing environment it created at AFI Mezzeh to cause extreme mental anguish and pain to Plaintiff and other detainees. *Supra* pp. 4–6. Accordingly, Syria is liable to Plaintiff for IIED.

### III.    Having Established Syria's Liability, Plaintiff Is Entitled to Damages

Under 28 U.S.C. § 1605A(c), foreign States are liable to victims of state-sponsored terrorism for money damages, including "economic damages, solatium, pain and suffering, and punitive damages." Plaintiff "must prove the amount of damages by a 'reasonable estimate' consistent with this Circuit's application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (alteration omitted) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)). "In determining the 'reasonable estimate,' courts may look to expert testimony and prior awards for comparable injury." *Thuneibat*, 167 F. Supp. 3d at 48; *accord, e.g.*, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). Under this framework Plaintiff is entitled to an award for pain and suffering and punitive damages.

### A.   Plaintiff Is Entitled to Damages for Pain and Suffering

In FSIA cases, damages for emotional distress and mental anguish are classified as pain and suffering damages. *See Saberi*, 541 F. Supp. 3d at 84. For "intentional infliction of emotional distress, a plaintiff may recover compensatory damages for the injury itself and for conscious pain and suffering including mental and emotional anxiety." *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 428–29 (D.D.C. 2007) (alteration and quotation marks omitted). In *Nikbin*, for instance, pain-and-suffering damages encompassed "mental and emotional injuries"—including

"post-traumatic stress disorder, severe depression, and intense panic disorder"—to a plaintiff who had been detained and tortured by the Iranian government.  *Id.*; *see also Saberi*, 541 F. Supp. 3d at 84 (awarding damages for psychological pain and suffering).  Courts award damages for pain and suffering in two categories: (1) during captivity and (2) after release.

> ### i.    Plaintiff Is Entitled to Damages for Pain and Suffering Endured During Captivity

Although courts in this District generally "award roughly $10,000 for each day of captivity for the intense suffering experienced by a hostage during captivity," *Saberi*, 541 F. Supp. 3d at 82–83 (quotations marks omitted), they will dispense with the per diem approach for victims "who suffered harsh treatment and/or were held only briefly," *Wyatt*, 908 F. Supp. 2d at 231; *accord, e.g.*, *Acree v. Islamic Republic of Iraq*, 271 F. Supp. 2d 179, 219–20 (D.D.C. 2003); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 234 (D.D.C. 2002), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004).  That is because the per diem approach is "inadequate to compensate" such victims.  *Wyatt*, 908 F. Supp. 2d at 231.  As one court explained, "it would be ... perverse" to conclude that a victim of four days of extreme torture "is only entitled to $40,000."  *Cronin*, 238 F. Supp. 2d at 234.  In these situations, courts award larger lump sums in addition to, or in lieu of, per diem awards.  *See Wyatt*, 908 F. Supp. 2d at 231–32 (awarding lump sum of $5 million for pain and suffering endured during 21 days of captivity in Syria); *see also Cronin*, 238 F. Supp. 2d at 235 (awarding $1.2 million where plaintiff was detained, interrogated, and beaten for four days).

Courts may increase the lump sum if the plaintiff faced imminent death while in captivity. *See Azadeh v. Gov't of the Islamic Republic of Iran*, 2018 WL 4232913, at *18–19 (D.D.C. Sept. 5, 2018) (granting $1 million for each of the mock executions that placed plaintiff in fear of imminent death); *Kilburn*, 699 F. Supp. 2d at 157 (awarding additional $1 million "for the portion

of his life he spent facing certain death"); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269 (D.D.C. 2002) (same).

Here, Plaintiff is entitled to a lump sum that accounts for the severe physical and psychological torture he endured, including the abysmal conditions of his confinement. *See supra* pp. 6–20; *Wyatt*, 908 F. Supp. 2d at 231. The lump sum should also account for the threat of imminent death Plaintiff faced during his detention. Mzaik. Decl. ¶¶ 16–17, 34.

### ii. Plaintiff Is Entitled to an Additional Lump Sum to Compensate Him for Post-Release Pain and Suffering

In addition to damages for pain and suffering experienced during captivity, Plaintiff "may receive an 'additional lump sum,' which accounts for the trauma that [he] has endured—and will continue to experience"—post-captivity. *Saberi*, 541 F. Supp. 3d at 83 (quoting *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 346 (D.D.C. 2016)). To fashion a post-captivity award, Courts start with a baseline of *Hekmati*'s $10 million award for post-captivity pain and suffering, and adjust based on three factors: (1) the "length and severity of the plaintiff's detention and torture"; (2) the "extent of the plaintiff's lasting physical and mental injuries"; and (3) "the estimated number of years that the plaintiff can be expected to suffer from these injuries." *Azadeh*, 2018 WL 4232913, at *19. In applying these factors, courts can look to "[r]ecent awards in similar FSIA cases," "given the importance of ensuring that individuals with similar injuries receive similar awards." *Saberi*, 541 F. Supp. 3d at 83.

Hekmati was detained for 1,602 days in a cold, unsanitary cell, beaten with batons, whipped, shocked with a taser, handcuffed in stress positions, and given sedatives. *Hekmati*, 278 F. Supp. 3d at 150–52, 163–64. He had a 45-year life expectancy upon release. *Id.* at 164. In *Azadeh*, the plaintiff was detained for 114 days in the same prison, beaten while tied to a chair, whipped in her legs, kicked down a staircase, and forced to take sedatives. 2018 WL 4232913, at

*4–8, 17.  To "account for [her] five-year shorter life expectancy" the court pro-rated Hekmati's award to $8,888,889. *Id.* at *20.  In *Abedini*, the plaintiff endured similar abuse—being hung from the ceiling, shocked with a taser, starved, repeatedly beaten, and kept in "stress positions."  422 F. Supp. 3d at 126–27, 129, 137.  The court awarded him $9,630,000—between *Hekmati* and *Azadeh*'s awards because his life expectancy (43.2 years) and length of detention (1,268 days) fell between theirs.  *Id*. at 137.  Finally, although Saberi was not held for as long as the other plaintiffs and "did not experience the same degree of physical abuse," she "was subjected to similarly appalling conditions of confinement and psychological abuse" for 100 days.  *Saberi*, 541 F. Supp. 3d at 83.  As she had a longer life expectancy than the other plaintiffs (50 years), the court awarded her $9 million.  *Id.* at 84.

     *Length of detention and severity of torture.*  Plaintiff suffered intense physical torture—he was hit on the soles of his feet with pipes until he could not stand, kicked, punched, suffocated, and beaten with a hose.  *Supra* pp. 7–10.  Plaintiff was "subjected to similarly appalling conditions of confinement and psychological abuse" as the plaintiffs in *Saberi*, *Abedini*, *Azadeh*, and *Hekmati*.  *Saberi*, 541 F. Supp. 3d at 83; *see supra* pp. 10–13, 15–17.  He endured intense psychological torture through threats of sexual assault, torture, and death, and the forced witnessing of the torture of his cousin and other detainees.  *Supra* pp. 7–15.  Although Plaintiff was detained for a relatively shorter period than some plaintiffs, his torture was as severe.  The Court should award him a commensurate amount of damages.

     *Extent of lasting physical and mental injuries.*  Plaintiff suffered lasting physical and mental injuries.  Plaintiff contracted hepatitis due to the unsanitary conditions of his detention.  *Supra* p. 15.  According to Dr. Pérez-Sales's evaluation, detention conditions and torture suffered by Plaintiff caused lasting psychological impacts to Plaintiff, including PTSD and depressive

disorder "characterized by sadness, anhedonia, irritability, secondary hyperphagia, anxiety and insomnia." Pérez-Sales Rep. ¶¶ 12–14. Abedini similarly suffered from PTSD and clinical depression, *Abedini*, 422 F. Supp. 3d at 133, and Azadeh also suffered from PTSD, *Azadeh*, 2018 WL 4232913, at *19. This factor also favors an award similar to those cases.

> *Post-captivity life expectancy.* Courts look to a plaintiff's post-captivity life expectancy because plaintiffs "will likely continue to endure [psychological harm] throughout the rest of their lives." *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005). Courts weigh this factor heavily. For instance, the *Saberi* court awarded $9 million for 100 days in confinement (in contrast to Hekmati's 1,602 days) because the plaintiff had a 50-year life expectancy—5 years more than Hekmati's. 541 F. Supp. 3d at 84–85 (noting the plaintiff will likely endure psychological suffering "for the next four decades."). Plaintiff was released at 22 years old, with a life expectancy of approximately 51.5 years. *See* Sherry L. Murphy et. al, *Deaths: Final Data for 2021*, NAT'L VITAL STATS. REPS. Oct. 2024, at 8 (total life expectancy for males of 73.5). This is similar to Saberi's 50 years, and longer than Abedini, Azadeh, and Hekmati's 40 to 45 years, meriting a commensurate award. All three factors favor a pain and suffering award that approximates the sums awarded in *Saberi*, *Abedini*, *Azadeh*, and *Hekmati*, in an amount to be determined by the Court.

### B. The Court Should Award Plaintiff Punitive Damages

The FSIA terrorism exception authorizes punitive damages, which are awarded to "punish outrageous behavior and deter such outrageous conduct in the future." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 59 (D.D.C. 2018). "Courts routinely award punitive damages in cases brought under the" FSIA terrorism exception. *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 116 (D.D.C. 2020). In quantifying punitive damages, courts typically

consider "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Saberi*, 541 F. Supp. 3d at 87 (quoting *Warmbier*, 356 F. Supp. 3d at 59). The Assad regime's campaign of torture, murder, and enforced disappearance is precisely the type of "outrageous" conduct that this Court has held merits punitive damages under this framework.

### i.    The Wealth of the Defendant

This Court has found that "Syria is a sovereign that has substantial wealth." *Colvin*, 363 F. Supp. 3d at 163 (D.D.C. 2019).

### ii.    The Character of Syria's Act

"Torture, by definition, involves 'extreme and outrageous' conduct." *Abedini*, 422 F. Supp. 3d at 133. Torture is a violation of a *jus cogens* norm, an absolute prohibition "from which no derogation is permitted" that "enjoy[s] the highest status within international law." *Princz*, 26 F.3d at 1173 (internal citations omitted).

As documented in the 35 sworn declarations and five expert reports submitted in support of this motion, Plaintiff's torture was not an isolated incident. It was the direct result of the Assad regime's campaign of arrest, detention, interrogation, torture, and murder. *Supra* pp. 4–6. The regime's campaign was so heinous in part because of its intent to "violently repress" actual and perceived democratic opposition to Assad's authoritarian rule "by any means." Ex. A, ¶ 294. Conduct of such repressive character merits punitive damages to condemn the Assad regime's practice of "achieving political victory through heinous acts of barbarism." *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 74–75 (D.D.C. 2008); *see also Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 102, 114 (D.D.C. 2000) (awarding $300 million in punitive damages based on finding that assassination of a dissident "for his outspoken criticism of the Iranian

regime" was part of "intentional, premeditated, malicious, and cruel" strategy to "decapitate the opposition" and thus warranted the "substantial punitive damages awarded" because it "violate[d] fundamental precepts of international law" and because of a need to "recognize society's interest in the free expression of political ideas"); *Colvin*, 363 F. Supp. 3d at 164 (D.D.C. 2019) (noting that large punitive damages awards are merited in cases involving a single victim that "was targeted by the foreign state for a particular reason").

The regime's direct responsibility for this campaign of torture and killing also supports a significant punitive damages award.  Unlike the defendants in most FSIA cases, the Assad regime was not merely a financial accomplice; it was the direct perpetrator of the torture and the broader campaign from which it resulted.  *Compare Kim*, 87 F. Supp. 3d at 291 (awarding $300 million in punitive damages for North Korea's abduction, torture and killing of a missionary), *with Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 41 (D.D.C. 2022) (using a lesser multiplier for punitive damages when a state sponsors, but does not directly participate in, terrorist activity).

### iii.    The Nature and Extent of Harm That Syria Intended to Cause

*Harm to Plaintiff and other detainees.*  Plaintiff will suffer the physical and psychological effects of his detention for the rest of his life.  Thousands of former detainees are dead, and thousands more lived through unimaginable torture and now survive with enduring physical and psychological harms, including PTSD, that permeate every area of their lives.  *Supra* pp. 7–13; Ex. A, ¶¶ 220–22, 226.  Former detainees also have difficulty securing housing, employment, or returning to education because employers or schools discriminate against former detainees.  Baker and Üngör Rep. ¶ 77; Ex. A, ¶¶ 223–24, 227.

The impacts of the psychological torture endured by those detained by the Assad regime are especially pernicious.  Acts intending to cause mental pain and suffering are "often associated with more severe and lasting clinical symptoms than" acts which cause physical harm.  Pérez-

Sales Rep. ¶ 16.    They cause "profound and lasting" mental health impacts, which are commonplace among former detainees from Syrian prisons.  Seif Rep. ¶ 118; Pérez-Sales Rep. ¶¶ 24, 34, 43.  After release, many former detainees have nightmares, intrusive thoughts, and flashbacks, and are "haunted by the terror of detention."  Seif Rep. ¶ 119; Pérez-Sales Rep. ¶ 34.[46] Former detainees have been diagnosed with insomnia, psychosis, panic attacks, anxiety disorders, depression, sleep disorders, drug addictions, and PTSD.  Seif Rep. ¶ 120; Pérez-Sales Rep. ¶¶ 24, 34, 41.  Some experience suicidal ideations and other forms of self-harm.  Seif Rep. ¶ 121; Baker and Üngör Rep. ¶ 75; *see, e.g.*, Al-Najjar Decl. ¶ 20; SJAC.W009 Decl. ¶ 50.  Without treatment, the impact of detention and torture affects all aspects of former detainees' lives, preventing former detainees from working, caring for their children, and otherwise participating fully in society.  Seif Rep. ¶¶ 121-22; Pérez-Sales Rep. ¶¶ 23, 27.  Mahmoud Hamoud, a former AFI Mezzeh detainee, said "[t]hat our own government did this to us—overseeing the systematic withering away of our bodies in silence—it leaves you with a sense of horror and insecurity in the world that follows you for the rest of your life."  Hamoud Decl. ¶ 50.

*Harm to detainees' families*.  Plaintiff's family, and the families of the other detained and disappeared, are also among the victims of Syria's campaign of arrest and torture.  They experience devastating impacts from the detention, forced disappearance, torture, and killing of their relatives.  Ex. A, ¶¶ 201–18, 225.

Family members, particularly children, suffer emotional trauma from missing their loved ones while they are detained, even when they know where they are.  Seif Rep. ¶¶ 37–40.  This

---

[46] *See also* Zahlout Decl. ¶ 16; Halema Decl. ¶ 22 ("My detention has severely affected my mental health to this day ... especially since it happened during my childhood."); Sawan Decl. ¶ 41 ("I still experience fear and panic while eating or sleeping, as... I feel I'm still being pursued by security forces and that someone wants to torture and kill me."); Fares Decl. ¶ 20; SJAC.W002 Decl. ¶ 18.

trauma is compounded by the uncertainty of forced disappearances. "The families of detainees who were killed in detention have learned of their deaths in very cruel ways, if at all." Ex. A, ¶ 16. "The Syrian Government's intentional withholding of information regarding the true fates of thousands of detainees who have disappeared into the Government detention system continues to inflict severe suffering on their family members every day." *Id.* Families experience "terrible psychological suffering … as a result of the loss and pain of waiting for years without any information about the whereabouts and fate of their loved ones." Seif Rep. ¶ 38; *see also* Baker and Üngör Rep. ¶ 77; Duhaime Rep. ¶¶ 34–42. Plaintiff's family desperately searched to determine his whereabouts, and experienced emotional trauma not knowing if he was alive or dead. *See* Mzaik Decl. ¶¶ 43–47. Yassin al-Haj Saleh, whose wife has been detained for over a decade, described not knowing as the "harshest" part of enforced disappearance: "[W]e do not know if our loved ones are alive or have been killed. If the latter is true, then when, how, and where? Where are their bodies?" Seif Rep. ¶ 39. Under international human rights law, family members' suffering constitutes cruel, inhumane, or degrading treatment, and in some cases, torture. Duhaime Rep. ¶¶ 34–35; Seif Rep. ¶¶ 37. Even after the fall of the regime, over 100,000 people remain missing, and these harms continue. *Supra* p. 18.

From the moment of arrest, through detention, while searching for their loved ones, and after release, regime forces harassed, threatened, and assaulted detainees' family members.[47] Plaintiff's family also paid an expensive bribe to secure his release. Mzaik Decl. ¶ 45. Many

---

[47] Seif Rep. ¶¶ 43, 49; Duhaime Rep. ¶¶ 26–27, 29; Maatouq Decl.¶¶ 35–37 (threat to arrest his son and wife and to cut off wife's tongue); Awad Decl. ¶ 5 (threat to kill family); SCM.023 Decl. ¶ 23 (thinly veiled threat to rape wife); SJAC.W005 Decl. ¶¶ 9–12 (threat to arrest family); Bin Ibrahim Decl.¶ 27 (same).

families meet with "dangerous intermediaries who extort them financially and emotionally in exchange for information or promises of release." Seif Rep. ¶ 52.[48]

"[T]he impacts of the detention and enforced disappearance of relatives manifest in a context of patriarchal social norms and existing inequalities ... [and] tend to place higher risk of gendered harms on women than men." Seif Rep. ¶ 32. Women in particular reported sexual harassment and assault during and after the arrest of their family members. *Id.* ¶ 43. Families perceive that women are less likely to be detained, so women often bear the burden of searching for their detained family members, exposing women to "arbitrary detention, additional enforced disappearances, sexual abuse, physical and sexual extortion and other forms of violence." *Id.* ¶ 53; Duhaime Rep. ¶ 29; Baker and Üngör Rep. ¶ 76. Men are typically the breadwinners in Syrian society, and when they are arrested female household members "struggle economically, and are hardly able to afford the bare necessities (rent and bills, food, medical treatment, transportation, and children's education)." Seif Rep. ¶¶ 47–48; Duhaime Rep. ¶¶ 39–41.

*Harm to Syrian society.* Plaintiff's detention and torture was part of a larger pattern of violence that inflicted broad societal harms, stifling democratic decision-making and entrenching dictatorship. *Supra* pp. 2–6. The Assad regime's ultimate goal through detention, torture, and enforced disappearance was to deter dissent and opposition, both in the individual detainees and in society as a whole. *Supra* pp. 2–6; Ex. A, ¶ 294. This was devastatingly effective. Plaintiff has not returned to Syria for fear of being detained, tortured, and killed. Mzaik Decl. ¶ 48. Like Plaintiff, many former detainees who had the means to do so fled Syria, often enduring dangerous journeys. *See* Baker and Üngör Rep. ¶ 75. Former detainees who remained in Syria often avoided

---

[48] Duhaime Rep. ¶ 27 (families spend "large amounts of money" on bribes); Al-Abdullah Decl. ¶¶ 32–34 (paid equivalent of $20,000); Bin Ibrahim Decl. ¶ 40; SJAC.W009 Decl. ¶ 57.

leaving their homes out of fear—let alone engaging in continued activism. *Id.* ¶ 77. Because the Assad regime targeted family, friends, and entire communities, potential activists feared not only for themselves, but also for their loved ones. "Those who might otherwise speak out against the regime's policies of detention and torture live in fear of reprisal—that the intelligence service's mechanisms might be directed at them for their protest." *Id.* ¶ 78. Even outside of Syria, many were afraid to speak out against the regime because of threats to their family and friends in Syria. *Id.* Indeed, Plaintiff initially filed these claims under pseudonym due to the risk speaking out about his detention posed to his family. *See* Dkt. 3.

GBV in detention is particularly effective as a means of deterring activism. The Syrian culture of discriminating against and shaming GBV survivors, and the perception that all female prisoners are raped, creates an enormous stigma against female former detainees. Women avoided activism out of fear of rape in prison. Seif Rep. ¶ 73; *see also* Ex. A, ¶ 228.

The system of detention, torture, and enforced disappearance was at such an enormous scale that it terrorized and humiliated the entire population. Baker and Üngör Rep. ¶ 72. Indeed, "[t]he violence is of such a degree and nature that it pose[d] a threat to the viability and stability of Syrian society. It generate[d] pervasive fear, collective trauma, economic stagnation, sectarian polarization, stifling of talent, persistent injustice, and prevention of alternative futures for the country." *Id.* ¶ 28. Speaking out was impossible, and democratic dissent was quashed.

#### iv.    The Need for Deterrence

Understanding the intentional societal harm caused by the Assad regime's detention practices is essential to assessing the magnitude of the harm and the commensurate need for deterrence. Seif Rep. ¶ 29. Harms of such enormity can only be deterred through commensurate punitive damages that are substantial enough to deter similar conduct. *See Gates*, 580 F. Supp. 2d

at 75 (awarding $300 million in punitive damages against Syria for extrajudicial killing in the hope that "substantial awards will deter" similar conduct), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011). "[O]nly a large amount of punitive damages can serve as an effective deterrent." *Colvin*, 363 F. Supp. 3d at 163, 165 (awarding 300 million in punitive damages for Syria's murder of a journalist) (quotations omitted). Moreover, when crimes are "part of a longstanding pattern and policy," the "need for deterrence [is] clear." *Abedini*, 422 F. Supp. 3d at 141. The Assad regime's campaign of torture was intentional and longstanding. Particularly at a time of transition in Syria, the Court should send a strong signal that would deter future Syrian state actors from similar conduct.

Accordingly, this Court should award punitive damages that adequately acknowledge the nature of the Assad regime's crimes, the widespread harm to Plaintiff, his family, other detainees, their families, and Syrian society, and the need to deter systematic quashing of democratic dissent.

## CONCLUSION

For all the reasons stated above, Plaintiff asks the Court to find Defendant liable under section 1605A of the FSIA and award him damages, along with any further relief the Court may deem just and proper.

Dated: December 20, 2024

Respectfully submitted,

/s/  Daniel McLaughlin

Daniel McLaughlin (D.D.C. Bar No. 7590654)
dmclaughlin@cja.org
Lindsay Bailey (admitted pro hac vice)
lbailey@cja.org
Ahmad Soliman (admitted pro hac vice)
asoliman@cja.org
Carmen K. Cheung (admitted pro hac vice)
ccheung@cja.org
Center for Justice & Accountability
268 Bush Street. #3432
San Francisco, CA 94104
Telephone: (415) 544-0444

/s/ Lee P. Rovinescu

Lee P. Rovinescu (admitted pro hac vice)
lee.rovinescu@freshfields.com
David Y. Livshiz (D.D.C. Bar. No. NY0269)
david.livshiz@freshfields.com
Scott A. Eisman (D.D.C. Bar No. NY0326)
scott.eisman@freshfields.com
Ruth Montiel (admitted pro hac vice)
ruth.montiel@freshfields.com
Anika Havaldar (D.D.C. Bar No. D00568)
anika.havaldar@freshfields.com
Kyle T. Ishman (pro hac vice pending)
kyle.ishman@freshfields.com
Elischke de Villiers (pro hac vice pending)
elischke.devilliers@freshfields.com
Grace W. Brody (pro hac vice pending)
grace.brody@freshfields.com
Elizabeth R. Lewis (pro hac vice pending)
liz.lewis@freshfields.com
Young G. Park (pro hac vice pending)
young.park@freshfields.com
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001

*Attorneys for Plaintiff*